**KENNECOTT UTAH COPPER CORPORATION,**
**Petitioner,**

v.

**UNITED STATES DEPARTMENT OF the INTERIOR, Respondent,**

**American Iron and Steel Institute, Intervenor.**

Nos. 93–1700, 94–1462, 94–1467, 94–1468, 94–1470, 94–1472, 94–1474 and 94–5249.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 20, 1996.

Decided July 16, 1996.

As Amended July 16 and Aug. 5, 1996.

Angus Macbeth and Richard B. Stewart, Washington, DC, argued the cause for petitioners Kennecott Utah Copper Corporation ("Kennecott") and the Industry and Sanitation Districts ("Industry Petitioners"). James L. Connaughton, and Dennis D. Hirsch, Washington, DC, were on the briefs for Kennecott and Industry Petitioners. Robin S. Conrad, Washington, DC, Jan Amundson, Alexandria, VA, Phillip D. Brady, Kathy D. Bailey, Cynthia H. Evans, Phyllis B. Levine, Roderick T. Dwyer, Christopher Harris, G. William Frick, Washington, DC, Philip A. Cooney, Wyndmoor, PA, David F. Zoll, Washington, DC, Ronald Shipley, Germantown, MD, Barbara A. Hindin, Washington, DC, Maurice H. McBride, Robert Brager, Nancy D. Tammi, Karl S. Bourdeau, Washington, DC, Karl S. Lytz, Kimberly M. McCormick, San Francisco, CA, David J. Barrett, Albany, NY, Paul B. Galvani, Roscoe Trimmier, Boston, MA, Frank Rothman, Los Angeles, CA, Peter Simshauser, San Francisco, CA and Lloyd S. Guerci, Washington, DC, were also on the briefs for Industry Petitioners.

Charles E. Magraw, Helena, MT, argued the cause and filed the briefs for petitioner State of Montana.

Naikang Tsao and Greer Goldman, Washington, DC, Attorneys, United States Department of Justice, argued the cause for appellee. With them on the brief was Lois J. Schiffer, Assistant Attorney General, Natalie M. Duval, Attorney, United States Department of Justice, and Steven K. Linscheid, United States Department of the Interior.

Jacques B. Gelin and John A. Bryson, Attorneys, United States Department of Justice, entered appearances.

Gordon J. Johnson, New York City, argued the cause for the State intervenors. With him on the briefs were Dennis C. Vacco, Albany, NY, Scott Harshbarger, William Pardee, Karen McGuire, Boston, MA, Joseph P. Mazurek, Charles E. Magraw, Helena, MT, Tom Udall, Charles De Saillan, Santa Fe, NM, Betty D. Montgomery, Stamford, CT, Margaret A. Malone, Columbus, OH, Richard Blumenthal, Hartford, CT and Brian J. Comerford, Columbus, OH. Barton C. Green, Pocatello, ID and Jack A. Kley entered appearances.

Richard B. Stewart, James L. Connaughton, Robin Conrad, Washington, DC, Jan Amundson, Alexander, VA, Phillip D. Brady, Kathy D. Bailey, Cynthia H. Evans, Phyllis B. Levine, Roderick T. Dwyer, G. William Frick, Washington, DC, Philip A. Cooney, Wyndmoor, PA, David F. Zoll, Washington, DC, Ronald Shipley, Germantown, MD, Barbara Hindin, Washington, DC, Maurice H. McBride, Robert Brager, Nancy D. Tammi, Karl S. Bourdeau, Washington, DC, Karl S. Lytz, Kimberly M. McCormick, San Francisco, CA, David J. Barrett, Albany, NY, Paul B. Galvani, Roscoe Trimmier, Boston, MA, Frank Rothman, Los Angeles, CA, Peter Simshauser, San Francisco, CA and Lloyd S. Guerci, Washington, DC, filed a brief for Industry Petitioners as intervenors.

Before: GINSBURG, RANDOLPH and TATEL, Circuit Judges.

## TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1199

II. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1202
 A. Procedural Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1202
 1. Kennecott's Freedom of Information Act claim . . . . . . . . . . . . . . . . . . . . . . . .1202
 2. Kennecott's Federal Register Act claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1203
 3. Kennecott's APA claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1207
 4. Industry Petitioners' APA claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1207
 B. Substantive Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1209
 1. Statute of limitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1209
 2. Time bar to substantive challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1213
 3. Protocols and procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1215
 4. Cost effectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1217
 5. Gross disproportionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1218
 6. Consistency with response . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1218

7. Services ............................................... 1220
8. Acquisition of federal lands ........................ 1221
9. Cultural and archaeological resources .............. 1221
10. Indirect costs ...................................... 1223
11. Reasonableness of assessment costs ................ 1224
12. Interim services ................................... 1226
13. Priority of remedies ............................... 1229

III. CONCLUSION ........................................... 1231

Opinion for the Court by GINSBURG, RANDOLPH and TATEL, Circuit Judges.

GINSBURG, RANDOLPH, and TATEL, Circuit Judges:

In these consolidated cases we once again consider challenges to the Department of the Interior's "Type B" Natural Resource Damage Assessment regulations. Under both the federal Superfund statute and the Clean Water Act, federal and state officials, acting as trustees for the public, may recover money damages for the harm that the release of hazardous substances into the environment causes to certain natural resources. Type B NRDA regulations set forth a process that trustees may follow not only in calculating the monetary value of that injury to natural resources, but also in collecting and spending the funds they recover.

Interior first published final Type B NRDA regulations almost a decade ago. We invalidated portions of those regulations in *Ohio v. United States Department of the Interior*, 880 F.2d 432 (D.C.Cir.1989). In response to *Ohio*, Interior finally released revised regulations in March 1994.

Today we address four arguments that the Government violated various procedural requirements in promulgating the 1994 Regulations and twelve arguments that the regulations are substantively defective. The procedural challenges come to us through: Kennecott Utah Copper Corporation's appeal of a summary judgment order issued by the United States District Court for the District of Columbia; a separate petition filed by Kennecott; and petitions filed by fifteen trade associations, seven corporations, and two county sanitation districts, collectively referred to as Industry Petitioners. The substantive challenges include eleven arguments presented in petitions filed by Industry Petitioners and one argument raised in a petition filed by the State of Montana.

In Part I we provide the factual and procedural background for this case. In Part II.A we address and reject each of the procedural challenges. In Part II.B we consider the substantive issues, rejecting Montana's challenge and all but two of Industry Petitioners' arguments. We therefore affirm the district court's order, deny Montana's petition, and grant in part Industry Petitioners' petitions for review.

## I. BACKGROUND

The federal Superfund statute, more formally known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 or "CERCLA," Pub.L. No. 96–510, 94 Stat. 2767 (1980) (amended by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613), makes specified classes of parties—including past and present owners and operators of hazardous waste sites, transporters of hazardous substances, waste generators, and others who arrange for the disposal, treatment, or transport of hazardous substances—potentially liable for the expenses that the federal and state governments, as well as Indian tribes, incur in responding to the release of hazardous substances into the environment. *See* 42 U.S.C. § 9607(a)(1)-(4)(B). These include expenses not only for the "removal" of hazardous wastes themselves, but also for more permanent "remedial action[s]," such as destroying or recycling hazardous substances, repairing leaking containers, and establishing a protective perimeter around hazardous waste sites. *See* § 9601(23)-(24).

In addition, and at the heart of this case, responsible parties are financially liable for

"injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss," caused by the release of hazardous substances. 42 U.S.C. § 9607(a)(4)(C). The term "natural resources" means all "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States[,] . . . any State or local government, any foreign government, any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe." § 9601(16). Section 107 of CERCLA authorizes federal and state officials, acting as public trustees, to sue responsible parties to recover damages for the harm to natural resources caused by the release of hazardous substances. § 9607(f)(1). Trustees may use the funds they recover "to restore, replace, or acquire the equivalent of such natural resources." *Id.*

Section 311 of the Clean Water Act also authorizes federal and state officials to sue as public trustees to recover "any costs or expenses incurred by the Federal Government or any State government in the restoration or replacement of natural resources damaged or destroyed as a result of a discharge of oil or a hazardous substance" in navigable waters. 33 U.S.C. § 1321(f)(4). Trustees suing under § 311 of the Clean Water Act may use recovered funds "to restore, rehabilitate or acquire the equivalent of such natural resources." § 1321(f)(5).

Once a trustee suing under either § 107 of CERCLA or § 311 of the Clean Water Act determines the amount of damages in accordance with federal regulations promulgated under § 301(c) of CERCLA, 42 U.S.C. § 9651(c), the trustee's assessment enjoys a rebuttable presumption in administrative proceedings and in court. § 9607(f)(2)(C). Section 301(c), in turn, requires the federal government to issue regulations that "specify[:] (A) standard procedures for simplified assessments" in situations requiring "minimal field observation" (Type A regulations); "and (B) alternative protocols for conducting assessments in individual cases" requiring

more detailed evaluations (Type B regulations). § 9651(c)(2). The statute further provides that

> [s]uch regulations shall identify the best available procedures to determine such damages, including both direct and indirect injury, destruction, or loss and shall take into consideration factors including, but not limited to, replacement value, use value, and ability of the ecosystem or resource to recover.

*Id.* The government must review these regulations every two years, revising them as appropriate. 42 U.S.C. § 9651(c)(3).

As in *Ohio v. United States Department of the Interior,* we are concerned here only with Type B regulations. In *Ohio,* we considered the Type B regulations that the Department of the Interior initially issued in August 1986, 51 Fed.Reg. 27,674 (1986), and later revised in February 1988, 53 Fed.Reg. 5,166 (1988). *See Ohio,* 880 F.2d at 440. Addressing eleven issues, we granted the petition for review with respect to two and remanded a third to the agency, instructing Interior to proceed in issuing new regulations in conformity with our opinion "as expeditiously as possible." *Id.* at 481. In response, in April 1991, Interior proposed new regulations, which left most of the prior rules in place, but changed specific sections to address the concerns we raised in *Ohio. See* 56 Fed.Reg. 19,752 at 19,767–73 (1991). Although the public comment period on those proposed regulations ended in mid-July of 1991, *see* 56 Fed.Reg. 30,367 (1991), Interior had still not approved or issued final rules by the time of the November 1992 Presidential election.

In mid-January 1993, shortly before President Clinton's inauguration, Interior's Assistant Secretary for Policy, Management and Budget approved a set of Type B regulations, which differed from those proposed in April 1991, and directed a subordinate to send the document to the Office of the Federal Register ("OFR") for publication as final regulations. The OFR received an original and two copies of these signed regulations—which we shall call the "1993 Document"—sometime after 2:00 p.m. on January 19, 1993, the final full day of the Bush Administration. On January 21—just two days after the OFR

received the 1993 Document, and before the OFR filed the document for public inspection—an Interior employee, at the direction of the new acting Assistant Secretary for Policy, Management and Budget, telephoned the OFR to withdraw the document. The employee confirmed the request in writing later the same day. In accordance with its regulations and internal guidelines, the OFR stopped processing the 1993 Document and returned all three copies to Interior, recording the action in the "Kill Book," a handwritten ledger the OFR maintained to keep track of documents withdrawn by agencies.

Several months later, in July 1993, Interior reopened the public comment period on the regulations it had proposed in April 1991, while also suggesting further revisions to those proposed rules. 58 Fed.Reg. 39,328 at 39,329 (1993). Interior issued final regulations in March 1994, 59 Fed.Reg. 14,262 (1994). These regulations are the subject of the challenges before us today.

Like their predecessors, the 1994 Regulations provide a four-stage framework for trustees to follow in assessing natural resource damages. *Compare* 56 Fed.Reg. 19,-752 at 19,754 (proposed April 1991 Regulations); 51 Fed.Reg.27,674 at 27,677–80 (final August 1986 Regulations) *with* 59 Fed.Reg. 14,262 at 14,262–63 (final 1994 Regulations). In the first stage, trustees conduct a "preassessment screen," in which they review readily available information to determine whether there is a reasonable probability that a claim will be successful, thus justifying the expense and effort of conducting a full assessment. 43 C.F.R. §§ 11.23–25 (1995). In the second stage, the trustee develops an "assessment plan," which describes in some detail how the trustee expects to determine the monetary value of injury suffered by the natural resources, including but not limited to stating whether the trustee intends to conduct a Type A or Type B assessment. 43 C.F.R. §§ 11.30–11.35; 59 Fed.Reg. at 14,-281–83. During the third stage, the trustee conducts the assessment, which in the case of Type B assessments involve three phases: an "injury determination phase," when the trustee ascertains whether the release of a hazardous substance has, in fact, caused inju-

ry to natural resources, 43 C.F.R. §§ 11.60–11.64; a "quantification phase," when the trustee determines the extent of the physical injury, as compared to the baseline conditions that would have existed if the hazardous substances had not been released into the environment, 43 C.F.R. §§ 11.70–11.73; 59 Fed.Reg. at 14,283; and the crucial "damage determination" phase, when the trustee determines the amount of money it will seek to compensate for the injuries to the natural resources. 43 C.F.R. §§ 11.80–11.84; 59 Fed.Reg. at 14,283–87. Having conducted the assessment, the trustee proceeds to the fourth stage, the "post-assessment" phase, during which the trustee prepares a report describing the assessment; presents a demand to potentially responsible parties for their share of the damages, filing suit if appropriate; and if successful in recovering funds, develops a plan to restore the injured natural resources. 43 C.F.R. §§ 11.90–11.93; 59 Fed.Reg. at 14,287–88.

Both Kennecott and Industry Petitioners challenge the validity of the 1994 Regulations based on the process the Government used in withdrawing the 1993 Document and issuing the 1994 Regulations. Claiming that both the Freedom of Information Act, 5 U.S.C. § 552, and the Federal Register Act, 44 U.S.C. §§ 1504–05, required the Government to publish the 1993 Document, Kennecott sued in the United States District Court seeking an injunction requiring the 1993 Document's publication. Because the district court concluded that it lacked authority to order publication under the Freedom of Information Act, and found no violation of the Federal Register Act, it granted summary judgment for the Government. *Kennecott Utah Copper Corp. v. United States Department of the Interior*, No. 93–2223 (D.D.C. June 30, 1994). Kennecott now appeals the district court's order. Kennecott has also filed a petition for review in this court pursuant to § 113 of CERCLA, 42 U.S.C. § 9613(a), arguing that certain actions taken by Interior during 1993 improperly rescinded the 1993 Document without complying with the notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553(b)-(c). Industry Petitioners make a

similar, though not identical, argument. They contend that Interior's very issuance of the 1994 Regulations improperly repealed the 1993 Document in violation of the notice and comment requirements of the APA. As a remedy for these procedural violations, Kennecott and Industry Petitioners ask us to declare the 1993 Document valid and to direct the Government to publish it.

In addition to these procedural arguments, Industry Petitioners raise eleven substantive challenges to the 1994 Regulations, claiming that the regulations not only exceed the agency's authority under CERCLA and the Clean Water Act, but also constitute arbitrary and capricious action. In its petition for review, the State of Montana argues that the 1994 Regulations do not go far enough in requiring trustees to restore natural resources to their untainted condition.

We consider each of the procedural and substantive issues in turn.

## II. ANALYSIS

### A. Procedural Challenges

At the outset, Interior urges us to find all procedural challenges to the 1994 Regulations moot. Because we agree with Interior that for other reasons we lack jurisdiction over Kennecott's Freedom of Information Act and APA claims, we need not consider whether those claims are moot. As for the two remaining claims—Kennecott's Federal Register Act claim and Industry Petitioners' APA claim—we consider and reject Interior's mootness arguments. Nonetheless, we agree with the agency that both claims fail on the merits.

### 1. Kennecott's Freedom of Information Act claim

The district court rejected Kennecott's Freedom of Information Act claim, ruling that because the Act did not authorize it to order the relief Kennecott requested—publication of the 1993 Document in the Federal Register—it lacked jurisdiction. Reviewing the district court's ruling *de novo, see Cope v. Scott,* 45 F.3d 445, 450 (D.C.Cir.1995), we affirm.

The Freedom of Information Act divides agency documents into three categories. The first includes "substantive rules of general applicability adopted as authorized by law." 5 U.S.C. § 552(a)(1)(D). The statute provides that agencies "shall ... currently publish" such documents. § 552(a)(1). The second category includes agency opinions, policy statements not previously published in the Federal Register, and administrative staff manuals, § 552(a)(2), which agencies must either "promptly publish[ ]" in the Federal Register or "make available for public inspection and copying." The third category includes all other records, which the agency must "make ... promptly available" upon request. § 552(a)(3). The statute's remedial provision, § 552(a)(4), governs judicial review of all three types of documents, *see* S.REP. No. 854, 93d Cong., 2d Sess. 9 (1974) (The "judicial review provisions apply to requests for information under subsections (a)(1) and (a)(2) of section 552 as well as under subsection (a)(3)."); *American Mail Line v. Gulick,* 411 F.2d 696, 701 (D.C.Cir.1969), granting district courts "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant," 5 U.S.C. § 552(a)(4)(B).

■ Kennecott argues that the 1993 Document falls into the first category—a "substantive rule of general applicability" that upon the signature of the Bush Administration Assistant Secretary, was "adopted as authorized by law." According to Kennecott, as soon as the Assistant Secretary signed the document, § 552(a)(1) imposed a legal obligation on the agency to publish it. Because we agree with the district court that § 552(a)(4)(B) does not authorize district courts to order publication of such documents, we need not decide whether the 1993 Document was "adopted" by virtue of the Assistant Secretary's signature, and thus whether § 552(a)(1) imposed a duty to publish the document.

While it might seem strange for Congress to command agencies to "currently publish" or "promptly publish" documents, without in the same statute providing courts with power to order publication, we think that is exactly

what Congress intended. Section 552(a)(4)(B) authorizes district courts to order the "production" of agency documents, not "publication." The question, then, is whether Congress intended "production" to include "publication." The dictionary does not resolve the matter. "Production" could mean either providing the document to an individual or broadcasting it to the broader public. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1810 (1993). Nor is this a situation where only one interpretation comports with the statute's purpose. The statute imposes "a general obligation on the agency to make information available to the public," *see Chrysler Corp. v. Brown,* 441 U.S. 281, 292, 99 S.Ct. 1705, 1712, 60 L.Ed.2d 208 (1979), an obligation that could be fulfilled either by handing the document over to an individual or by publishing it in the Federal Register. We think it significant, however, that § 552(a)(4)(B) is aimed at relieving the injury suffered by the individual complainant, not by the general public. It allows district courts to order "the production of any agency records improperly withheld *from the complainant,*" not agency records withheld from the *public.* 5 U.S.C. § 552(a)(4)(B) (emphasis added). Providing documents to the individual fully relieves whatever informational injury may have been suffered by that particular complainant; ordering publication goes well beyond that need.

Moreover, Congress has provided an alternative means for encouraging agencies to fulfill their obligation to publish materials in the Federal Register. As amended in 1974, § 552(a)(1) protects a person from being "adversely affected by" a regulation required to be published in the Federal Register unless an agency either published the regulation or the person had actual and timely notice of it. 5 U.S.C. § 552(a)(1); *see also Morton v. Ruiz,* 415 U.S. 199, 232–36, 94 S.Ct. 1055, 1073–75, 39 L.Ed.2d 270 (1974). This gives agencies a powerful incentive to publish any rules they expect to enforce. *See Morton,* 415 U.S. at 233 n. 27, 94 S.Ct. at 1073 n. 27 (quoting H.R.REP. No. 1497, 89th Cong., 2d Sess. 7 (1966) and citing S.REP. No. 813, 89th Cong., 1st Sess. 6 (1965)). We thus conclude

that § 552(a)(4)(B) does not authorize federal courts to order publication.

To support its contrary interpretation, Kennecott cites *Merrill v. Federal Open Market Committee of the Federal Reserve System,* 413 F.Supp. 494 (D.D.C.1976), *aff'd,* 565 F.2d 778 (D.C.Cir.1977), *vacated on other grounds,* 443 U.S. 340, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979), where the district court held that certain directives issued by the Federal Reserve System were statements of general policy that, under § 552(a)(1), must be published promptly in the Federal Register. *Merrill,* 413 F.Supp. at 506. Although we affirmed that conclusion, *Merrill,* 565 F.2d at 787, neither the district court nor we addressed the separate issue now before us: the power of district courts to order publication of documents under § 552(a)(4)(B). Indeed, the plaintiff in *Merrill* sought only a declaratory judgment that the Federal Reserve violated the Freedom of Information Act by delaying the "public release" of these documents, not an injunction requiring publication. *Merrill,* 413 F.Supp. at 499. Moreover, the district court ordered "production" of these records, not publication. *Id.* at 507.

■ Although Kennecott also argues that both the APA, 5 U.S.C. § 706(1), and the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361, authorize the district court to order publication of the 1993 Document for an alleged violation of the Freedom of Information Act, it did not make these arguments in district court. Ordinarily, we will not consider issues or legal theories appellants failed to raise in district court. *See, e.g., District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084 (D.C.Cir.1984). Kennecott has not suggested any circumstances justifying our departure from this rule. Finding that the Freedom of Information Act did not authorize the district court to order publication, we affirm summary judgment for Interior.

*2. Kennecott's Federal Register Act claim*

■ Kennecott next argues that the Federal Register Act required publication of the 1993 Document and that, by returning the document to Interior, the Office of the Federal Register violated the Act. Before ad-

dressing the merits of this argument, we consider Interior's contention that we lack jurisdiction to hear this claim. Although Interior characterizes its argument as one involving mootness, we think that, because Interior claims that Kennecott *never* suffered any injury traceable to the agency's failure to publish the 1993 Document, its argument is more properly viewed as a challenge to Kennecott's standing. To have standing, Kennecott "must have suffered an 'injury in fact,'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (quoting *Allen v. Wright*, 468 U.S. 737, 756, 104 S.Ct. 3315, 3327, 82 L.Ed.2d 556 (1984)); "there must be a causal connection between the injury and the conduct complained of"; and "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision,'" *id.* 560–61, 112 S.Ct. at 2136 (quoting *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 43, 96 S.Ct. 1917, 1924, 1926–27, 48 L.Ed.2d 450 (1976)).

Kennecott contends that the Government's failure to publish the 1993 Document, as required by the Federal Register Act, is causing it economic harm. Pointing to its current settlement negotiations with the State of Utah regarding the release of hazardous wastes in the Salt Lake City area, *see Utah v. Kennecott Corp.*, 801 F.Supp. 553 (D.Utah 1992), *appeal dismissed,* 14 F.3d 1489 (10th Cir.1994), Kennecott argues that if the Government published the 1993 Document in the Federal Register, it would be relevant to the parties and ultimately to a court in determining whether the proposed settlement is "'reasonable, fair, and consistent with the purposes that CERCLA is intended to serve.'" *Id.* at 567 (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 85 (1st Cir.1990) (in turn quoting H.R.REP. No. 253, 99th Cong., 1st Sess., pt. 3, 19 (1985))). In particular, Kennecott suggests that because the 1993 Document, unlike current regulations, would restrict the use of a technique for calculating liability known as "contingent valuation methodology," *see Ohio*, 880 F.2d at 475, publishing the 1993 Document would likely reduce its liability in an eventual settlement.

Interior responds that "there is no [legal] basis for Kennecott's professed entitlement to a specific [regulatory] provision." Interior Br. at 42. Although its meaning is not entirely clear, Interior seems to argue that Kennecott has not alleged an injury in fact— that is, an invasion of an interest protected by the Federal Register Act. *See Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (defining an "'injury in fact'" as "an invasion of a legally protected interest"). To support its point, Interior relies on *American Association of Retired Persons v. EEOC,* 823 F.2d 600 (D.C.Cir.1987), and *Estate of Smith v. Heckler,* 747 F.2d 583 (10th Cir.1984), for the proposition that individuals are not entitled to specific regulations, only reasonable ones. We disagree.

To begin with, the two cases relied on by Interior are irrelevant to this case. *American Association of Retired Persons* and *Estate of Smith* address whether the APA entitles a person to a particular regulation, *see American Ass'n of Retired Persons,* 823 F.2d at 604–05; *Estate of Smith,* 747 F.2d at 591, not whether the Federal Register Act requires an agency to issue a particular regulation. The Federal Register Act clearly imposes a duty upon the OFR to publish specific regulations—that is, to publish those documents that it receives from agencies and makes available for public inspection. *See* 44 U.S.C. § 1503 (requiring the OFR to "transmit ... to the Government Printing Office for printing ... each document required or authorized to be published by" 44 U.S.C. § 1505, which lists documents to be published in the Federal Register).

In our view, moreover, the economic injury Kennecott alleges is "arguably within the zone of interests ... protected" by the Federal Register Act. *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Congress enacted the statute to address the disorderly way in which the federal government was maintaining and distributing its regulations. As the House Judiciary Committee observed,

> [A]dministrative rules and pronouncements oftentimes cannot be found. As to their publication and distribution, there is utter

chaos. These rules and regulations frequently appear in separate paper pamphlets, some printed on single sheets of paper and easily lost. Any attempt to compile a complete private collection of these rules and regulations would be wellnigh impossible.... Officials of the department issuing them frequently do not know all of their own regulations.

H.R.REP. No. 280, 74th Cong., 1st Sess. 2 (1935). We thus understand the Federal Register Act to protect regulated entities from harm—including economic injury—they might suffer because of the government's failure to publish duly-approved regulations. Accordingly, we believe that Kennecott has suffered injury to an interest protected by the Federal Register Act.

Interior also argues that, because the State of Utah has decided *not* to avail itself of Interior's current regulations for assessing natural resources damages in its suit against Kennecott, *see Utah v. Kennecott Corp.*, 801 F.Supp. at 567, there is no causal connection between Interior's failure to publish the 1993 Document and Kennecott's position in its negotiations with Utah. Again, we disagree. Even though the 1993 Document would not have a binding effect on Utah, if published, the document would likely serve as a useful guide to the parties and, importantly, to a court in determining whether a consent decree is fair and reasonable. *See, e.g., United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1087 (1st Cir.1994) (in assessing reasonableness of settlement, court must assess potential liability of parties). We see this as a "fairly traceable" connection between the Government's failure to publish the 1993 Document and Kennecott's potential liability in the Utah litigation. *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136 (1992) (quoting *Simon*, 426 U.S. at 41, 96 S.Ct. at 1925–26) (internal quotation marks and brackets omitted). Kennecott therefore has standing to bring its Federal Register Act claim.

Turning to the merits, we agree with the district court and with Interior that the OFR adopted a permissible construction of the Act and, therefore, that the agency did not violate the statute by allowing Interior to withdraw the document. The Federal Register Act establishes a process for maintaining the government's rules and regulations and for publishing them in the Federal Register. Section 1 of the Act charges the Archivist of the United States, acting through the OFR, with "custody" of all documents required to be published in the Federal Register and, along with the Public Printer, with responsibility for "the prompt and uniform printing and distribution of" such documents. 44 U.S.C. § 1502. Section 2 describes the procedures the OFR must follow in maintaining and publishing documents. First, federal agencies "shall cause to be transmitted for filing" with the OFR the original and two copies of a document. § 1503. After transmittal, the original and copies "shall be filed with the Office." *Id.* The OFR must note "the day and hour of filing" on the original and both copies. *Id.* While the Archivist maintains the original "under regulations prescribed by the Archivist," at least one copy "[u]pon filing ... shall be immediately available for public inspection in the Office" and another copy "shall [be] transmit[ted] immediately to the Government Printing Office" for printing in the Federal Register. *Id.*

Pursuant to statute, *see* 44 U.S.C. § 1506, a committee chaired by the Archivist issued regulations in 1989 providing for a "confidential processing" period to take place *after* an agency transmits a document to the OFR and *before* the OFR makes the document available for public inspection. 54 Fed.Reg. 9,670 at 9,680 (1989); 1 C.F.R. §§ 17.1–17.2 (1996). The regulations provide that documents received after 2:00 p.m. are usually made available for public inspection three days later and sent to the Government Printing Office for publication on the fourth day. 1 C.F.R. § 17.2. During this three-day confidential processing period, the OFR reviews and edits documents to ensure that they are properly formatted for publication in the Federal Register. In an emergency, an agency may request faster processing; and when there are technical difficulties or a document is unusually long, as it was in this case, the OFR may take longer than three days. *See* §§ 17.3–17.7 (1996). The OFR's "Document Drafting Handbook," issued in 1991 pursuant to regulations, *see* § 15.10

(1996), permits an agency to withdraw a document by telephone at any time before the OFR made the document available for public inspection, provided that the agency follows up with a letter confirming the withdrawal. OFFICE OF THE FEDERAL REGISTER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, DOCUMENT DRAFTING HANDBOOK 66 (1991 Ed.).

Kennecott does not suggest—nor could it—that the OFR violated its own rules by allowing Interior to withdraw the 1993 Document: The OFR clearly followed its rules when it honored Interior's request to withdraw the 1993 Document, a request made two days after the OFR received the document, well within the established three-day processing period. Rather, Kennecott argues that in adopting the rules, the Government misconstrued the statute to allow agencies to withdraw documents at all. According to Kennecott, Congress has unequivocally required that, once the OFR receives a document, it must make it available for public inspection, unless an attack or threatened attack on the United States makes it impractical to publish the Federal Register. *See* 44 U.S.C. § 1505(c).

We review the OFR's interpretation under the two-step analysis set forth in *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Applying *Chevron* step one, we find that Congress has not "directly spoken to the precise question at issue": whether the OFR may confidentially process a document prior to making it available to the public and allow an agency to withdraw the document during this period. *Id.* at 842, 104 S.Ct. at 2781. The statute provides only that, at some point after an agency transmits documents to the OFR, the documents "shall be filed" (including being stamped with the day and time) and, upon filing, the document shall "immediately" be made available to the public. The statute says nothing about the OFR's power to review or return documents either between the time of transmittal and "filing" (i.e., being stamped with the date and time) or between the moment of filing and the time "immediately" thereafter when the document is made available for public inspection. Nor

does the legislative history indicate that Congress considered the details of the OFR's role in processing documents, including its authority to return documents to the issuing agency before they are made public. *See* H.R.REP. No. 280 at 3.

Proceeding to *Chevron* step two, we ask whether the OFR has adopted a "reasonable interpretation" of the statute—that is "whether 'the agency considered the matter in a detailed and reasoned fashion'" and whether "the interpretation is arguably consistent with the underlying statutory scheme in a substantive sense." *Rettig v. Pension Benefit Guaranty Corp.*, 744 F.2d 133, 151 (D.C.Cir.1984) (quoting *Chevron*, 467 U.S. at 865, 104 S.Ct. at 2793). Because Kennecott does not object to the manner in which the agency reached its interpretation of the statute, we consider only whether it is substantively reasonable. We think it is.

■ Allowing agencies to withdraw documents during the relatively brief processing period is consistent with the statute's purpose—establishing an orderly process for filing and publishing government regulations. By permitting agencies to correct mistakes and even to withdraw regulations until virtually the last minute before public release, the government's approach helps assure that regulations appearing in the Federal Register are as correct as possible in both form and substance. It thereby avoids the needless expense and effort of amending regulations through the public comment process when those corrections could have been made more easily before the documents' publication. At the same time, by providing a relatively tight time frame for processing documents, the government imposes discipline on agencies and on the OFR, thereby assuring that the work of publishing the government's regulations proceeds in an orderly fashion. Because interpreting the Federal Register Act to allow agencies to withdraw documents during the confidential processing period is reasonable, we affirm summary judgment for Interior on Kennecott's Federal Register Act claim.

### 3. Kennecott's APA claim

We agree with Interior that we lack statutory jurisdiction to consider Kennecott's APA claim under § 113(a) of CERCLA. Section 113(a) provides for review in this court of any "regulation promulgated" under CERCLA. 42 U.S.C. § 9613(a). We have interpreted "regulation" to mean a statement that has "'general applicability'" and that has the "'legal effect'" of "binding" the agency or other parties. *See Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537–539 (D.C.Cir.1986) (quoting 44 U.S.C. § 1510).

■ Kennecott points to three actions the agency took in withdrawing the 1993 Document that it claims amount to "regulation[s]" promulgated under CERCLA. The first is the July 1993 notice that reopened the comment period on the proposed 1991 Regulations. Although this action invited comment on proposed regulations, it is not a regulation because it did not impose substantive obligations on either the agency or other parties.

Kennecott also relies on a letter the agency sent to the Atlantic Richfield Corporation explaining the agency's decision not to publish the 1993 Document. We think that the letter does not help Kennecott's claim any more than the July 1993 notice. Because the letter neither lifted nor imposed legal duties on anyone, it too was not a regulation.

■ Citing *Natural Resources Defense Council, Inc. v. EPA*, 683 F.2d 752 (3d Cir. 1982) and *Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802, Kennecott finally claims that the agency's "indefinite postponement" of the 1993 Document qualifies as a regulation. We disagree. In the cases cited by Kennecott, the government had promulgated a final regulation and then either explicitly postponed its effective date, *Natural Resources Defense Council*, 683 F.2d at 761, or took action that resulted in postponing the effective date of its duly promulgated regulations, *Environmental Defense Fund*, 713 F.2d at 814–17. In finding that the agency's actions constituted regulations under the APA, we emphasized the immediate substantive impact of the agency's postponement decision on the parties' legal obligations under duly promulgated regulations. *Id.* at 816. In contrast, the agency here never issued the 1993 Document. Because its decision to withdraw the document did not alter substantive legal obligations under previously published regulations, the agency's decision to withdraw the document did not constitute a "regulation" within the meaning of § 113 of CERCLA.

### 4. Industry Petitioners' APA claim

We turn finally to Industry Petitioners' somewhat different attack on the withdrawal of the 1993 Document. Unlike Kennecott, they contend that the agency's final 1994 Regulations themselves repealed and modified the 1993 Document without offering the opportunity for notice and comment required by the APA. Because Industry Petitioners base their challenge on regulations promulgated under CERCLA, they satisfy § 113(a)'s jurisdictional requirement. We thus consider Interior's other jurisdictional argument—that Industry Petitioners' challenge is moot.

■ An issue becomes moot if intervening events leave the parties without "a legally cognizable interest" in our resolution of those issues. *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). Interior has the burden of proving that, because "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," Industry Petitioners lack such an interest. *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). In other words, Interior must demonstrate either that Industry Petitioners no longer suffer a legally cognizable injury traceable to the alleged violations, *see Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1018–19 (D.C.Cir.1991) (noting that a case is constitutionally moot if there is no longer "some trace of a continuing injury"), or that the court can no longer provide Industry Petitioners with any meaningful relief, *see Burlington Northern R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C.Cir. 1996) (noting that a case is moot if "intervening events make it impossible to grant the prevailing party effective relief").

In claiming that Interior withdrew the 1993 Document in violation of the notice and

comment provisions of the APA, Industry Petitioners assert that the Government has deprived them of a procedural right protected by that statute—the right that we have recognized under the APA "to participate in the rulemaking process," *Natural Resources Defense Council Inc. v. Nuclear Regulatory Commission,* 680 F.2d 810, 814 (D.C.Cir. 1982). Although agreeing that Industry Petitioners claim a violation of a procedural right, the agency argues that the "reopening of the comment period in July 1993 and the subsequent publication of the 1994 ... regulation[s]" gave Industry Petitioners all the procedural relief to which they are entitled, thereby rendering their challenges moot. Interior Br. at 72.

In support of its argument, Interior relies on two cases involving significantly different facts than we face here. In *Natural Resources Defense Council v. Nuclear Regulatory Commission,* we found that, by promulgating a second rule in accordance with the notice and comment requirements of APA, the agency had rendered moot petitioners' claim that the agency had failed to promulgate an earlier rule in conformity with the APA. 680 F.2d at 813–15. We extended this principle in *Save Our Cumberland Mountains, Inc. v. Clark,* 725 F.2d 1422, 1432 (D.C.Cir.), *reh'g granted and opinion vacated* (1984), finding that an agency's promulgation of a later rule in compliance with the APA completely eradicated any harm the petitioners may have suffered when the agency suspended an earlier published rule without providing opportunity for notice and comment. *Id.* at 1432–33. Because we vacated that opinion, while its reasoning may persuade, it does not bind us. *See Save Our Cumberland Mountains, Inc. v. Lujan,* 963 F.2d 1541, 1548 (D.C.Cir.1992).

■ Interior urges us to extend these cases even further by holding that the agency's later promulgation of a rule in compliance with the APA eradicates any harm petitioners may have suffered from the agency's failure to allow comment when withdrawing an unpublished document. Even assuming that the opportunity to comment when agencies promulgate rules is comparable to the opportunity to comment on the withdrawal of

unpublished documents, Interior's argument fails because the two sets of regulations before us did not cover all of the same issues. Unlike the other two cases, where the later regulations were "essentially the same" as the earlier one, *Natural Resources Defense Council,* 680 F.2d at 813, and "cover[ed] precisely the same subject matter as the withdrawn regulation," *Save Our Cumberland Mountains, Inc. v. Watt,* 558 F.Supp. 22, 24 n. 3 (D.D.C.1982), the 1994 Regulations did not address trustees' use of a contingent valuation methodology in the damage determination phase of their assessments, 59 Fed. Reg. at 14,266, an issue discussed extensively in the 1993 Document. Interior's reopening the comment period in July 1993 and publishing final regulations in 1994 thus did not give Industry Petitioners an opportunity to participate in the rulemaking process equivalent to the opportunity they would have had if the agency had permitted public comment on the withdrawal of the 1993 Document.

Although Industry Petitioners' challenge thus presents a live controversy, we agree with Interior that their argument is without merit. For one thing, their argument lacks a factual foundation. Contrary to their claims, the 1994 Regulations did not repeal or modify the 1993 Document for the simple reason that the 1993 Document never became a binding rule requiring repeal or modification. Rather, the 1994 Regulations replaced certain provisions in the then-current version of the Code of Federal Regulations.

■ The Industry Petitioners' argument also lacks legal foundation. Under their view, whenever agencies propose rules, receive comments from the public, and internally approve a draft version of the final regulations, the APA would prevent agencies from discarding those documents without again requesting public comment. They point to nothing in the text of the APA, its legislative history, or case law suggesting that Congress intended such an unlikely result. In fact, the APA only requires an agency to provide public notice and comment when "formulating, amending, or repealing a rule." 5 U.S.C. §§ 551(5), 553(b)-(c). A rule, in turn, is defined as "an agency statement of general or particular applicability and future

effect." § 551(4). In discarding the 1993 Document, the agency was in no sense "formulating" a rule. Instead, it rejected a document that had not yet been published. Nor did the agency "amend[ ]" or "repeal[ ]" a rule because the 1993 Document never became a rule subject to amendment or repeal.

Accordingly, all of the procedural challenges to the 1994 Regulations fail.

## B. Substantive Challenges

### 1. Statute of limitation

Section 113(g)(1) of the CERCLA provides that "no action may be commenced for damages ... unless that action is commenced within 3 years after the later of the following: (A) The date of discovery of the loss and its connection with the release in question. (B) The date on which regulations are promulgated under section 301(c)." 42 U.S.C. § 9613(g)(1). Interior in its 1994 Regulations, § 11.91(e), specified that for purposes of clause (B),

> the date on which regulations are promulgated under section 301(c) of CERCLA is the date on which the later of the revisions to the type A Rule and the type B Rule, pursuant to *State of Colorado v. United States Department of the Interior*, 880 F.2d 481 (D.C.Cir.1989) [Type A], and *State of Ohio v. United States Department of the Interior*, 880 F.2d 432 (D.C.Cir.1989) [Type B], is published as a final rule in the Federal Register.

The Industry Petitioners raise three objections to this provision. First, they contend that the Congress did not authorize Interior to define the term "promulgated" within the meaning of § 113(g)(1)(B). Second, they argue that § 11.91(e) cannot in any event survive step one of *Chevron* because (1) § 113(g)(1)(B) expressly provides that damage claims are barred if filed more than three years after Interior promulgated its regulations under § 301(c); and (2) those regulations were promulgated in 1986 and 1987; and (3) the term "promulgated" is unambiguous. Third, according to the Industry Petitioners, even if the statute is ambiguous, Interior's interpretation is not a permissible one under step two of *Chevron*

because it would authorize Interior to work an indefinite postponement of the limitation period simply by delaying its promulgation of the regulations.

*First.* Section 301(c) of the CERCLA authorizes Interior to "promulgate regulations for the assessment of damages for injury to ... natural resources." 42 U.S.C. § 9651(c). In § 113(g)(1)(B), the Congress linked the start of the statutory period for filing damage actions to the promulgation of those regulations. The Department suggests that this linkage implicitly delegates to Interior authority to interpret when the three-year statute of limitation begins to run.

The Industry Petitioners point out that nothing in § 301(c) of the CERCLA expressly authorizes Interior to set the period of limitation. On the contrary, they contend, because the period at issue controls the business of the courts, the resolution of any ambiguity in the statute is implicitly entrusted to the judicial branch. The Industry Petitioners claim to be aware of no instance where an executive branch department or agency has been granted authority to establish the period of limitation for bringing an action in court. And it would be remarkable, they observe, for the Congress to have placed such authority in the hands of Interior, which is frequently a plaintiff itself asserting damage claims in its capacity as a natural resource trustee.

Prior to amending the CERCLA in 1986, the Congress had specified a date certain (December 1980) for the opening of the limitation period, 42 U.S.C. § 9612(d) (1982), but because Interior took longer than anticipated to promulgate the regulations, in 1986 the Congress substituted an indefinite future date tied to the promulgation of the overdue regulations. This amendment, according to the Department, demonstrates that the Congress necessarily intended to delegate to Interior authority over the start of the three-year limitation period. Only in that manner could the Congress ensure that trustee complainants would have available legally effective protocols and procedures for assessing damages. Indeed, the amendment resurrected damage claims that would otherwise have been time-barred, which suggests that

the Congress was more concerned with achieving the remedial objectives of the statute than with granting repose to defendants.

This view finds support in the legislative history of the 1986 amendment. The Conference Committee noted that public trustees were hampered by Interior's "failure ... to promulgate regulations.... These amendments are intended to revive causes of action for natural resource damages that may have been foreclosed by the running of the statute." H.R. CONF. REP. No. 962, 99th Cong., 2d Sess. 223 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3276, 3316. Therefore it seems clear to us that the Congress linked the statutory period of limitation to the date upon which the regulations were to be promulgated in order to assure that public trustees could avail themselves of the rebuttable presumption provided under 42 U.S.C. § 9607(f)(2)(C). We are less comfortable in concluding that any ambiguity surrounding the term "promulgated" was to be resolved by Interior rather than by the courts. The mere linkage of the statutory period to the date of promulgation says little about the locus of responsibility for the interpretation of the statute.

We have dealt at least tangentially with this problem before. In *National Grain & Feed Ass'n, Inc. v. OSHA,* 845 F.2d 345 (D.C.Cir.1988), we intimated that an agency may construe the provision, in a statute entrusted to its administration, that establishes the time for bringing an action in court. There the OSHA had moved to dismiss a petition for review as untimely pursuant to 29 U.S.C. § 655(f), which provided that an OSHA standard may be challenged "at any time prior to the sixtieth day after such standard is promulgated." The disputed issue was the starting date of the 60–day period, which turned upon the meaning of the statutory term "promulgated." We said that

> OSHA may well have the power to equate the date of promulgation with the date of issuance, but it has not done so.... Based on the plain meaning of 29 U.S.C. § 655(f), the ordinary usage of the term promulgate, and the lack of any specific regulation defining the date of promul-

gation, we conclude that an OSHA standard is promulgated on the date that it is published in the Federal Register.

845 F.2d at 346.

Thus, in *National Grain* we acknowledged that the agency "may well have the power" by regulation to define, *i.e.,* to command judicial deference to its definition of, the date upon which a statutory period would commence—notwithstanding that the period applies to judicial and not to administrative proceedings. The Second Circuit reached the same conclusion in *United Technologies Corp. v. OSHA,* 836 F.2d 52, 53 (2d Cir.1987) ("The agency is certainly entitled to adopt a definition of 'promulgated,' and it may well have the power to equate 'promulgated' with 'issued,' if it chooses to do so. However, it has not yet done so").

Because there was no agency interpretation to which deference could be paid in those cases, however, the quoted statements were mere *dicta.* Moreover, both cases were decided before *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990), in which the Court held that a "precondition to deference under *Chevron* is a congressional delegation of administrative authority" over the enforcement scheme affected by an agency's regulation. *Id.* at 649, 110 S.Ct. at 1390–91. In this case, the agency has been delegated authority to promulgate regulations that determine the scope of liability but enforcement occurs in federal district court, not before the agency.

The dispute over Interior's authority to construe § 113(g)(1)(B) is, in our judgment, a close call. In light of our conclusion that the Department's interpretation of "promulgate" cannot survive even with the aid of *Chevron* deference, however, we need not resolve whether Interior is in fact entitled to that deference. Rather, we shall assume without deciding that the Congress has authorized the Department to define the term "promulgate" as it is used in § 113(g)(1)(B) of the CERCLA.

*Second.* The Industry Petitioners argue under *Chevron* step one that the Congress has "directly spoken to the precise question at issue." 467 U.S. at 842, 104 S.Ct. at 2781.

To "promulgate," they say, means "[t]o publish; to announce officially; to make public as important or obligatory." *Black's Law Dictionary* 1093 (5th ed.1979). According to the Industry Petitioners, Interior published the 1986 and 1987 Regulations, announced them officially, and made them obligatory— thereby establishing the date upon which the statutory limitation period would begin to run. Thus the Industry Petitioners' argument is that the statute is plain on its face and affords no support for Interior's putatively "tortured" view that a regulation is not promulgated until it has been judicially challenged, revised by the agency as necessary, and become final in the sense that there is no further possibility of judicially-mandated revision.

For the moment, we defer comment upon the validity of Interior's view. Our concern at this stage in our analysis is whether the statutory text is precise, not whether the agency's construction of that text is reasonable—a question to which we shall turn shortly. In order to determine whether "promulgated" has a precise meaning, we look to the manner in which it has been used and the extent to which those who must apply it have encountered interpretive difficulties. In *Colorado* we referred to the 1987 Type A Regulations as having been "promulgated ... in compliance with the statutory requirements" of § 301(c) of the CERCLA. 880 F.2d at 485. Two years later Interior itself, referring to both the 1987 Type A Regulations and its 1986 Type B Regulations, stated that "[t]he Department ... has promulgated various final rules for the assessment of damages for injuries to natural resources." 56 Fed.Reg. at 19,754. Clearly, both court and agency have, at least for certain purposes, regarded the 1986 and 1987 Regulations as having been "promulgated." That is not to say, however, that the term itself is unambiguous or that we have defined its contours by our use of it.

Interior points us to cases in which other courts have grappled with a related issue arising under § 113(g)(1)(B)—whether both Type A and Type B regulations must have been promulgated before the limitation period begins to run. *See, e.g., United States v.*

*City of Seattle,* 33 Env't Rep. Cas. 1549, 1551 (W.D.Wash.1991); *United States v. Montrose Chem. Corp.,* 883 F.Supp. 1396, 1402 (C.D.Cal.1995). These cases involve, albeit in a broader sense, the same question that we face here: Is "[t]he date on which regulations are promulgated under section 301(c)" unambiguous? Is it apparent, for example, that a rule is promulgated when it is issued or formally announced by an agency? Or must the rule be filed with the Office of the Federal Register? Or published in the Federal Register?

■ In *National Grain,* 845 F.2d at 346, we entertained these several possibilities. While we concluded that "an OSHA standard is promulgated on the date that it is published in the Federal Register," *accord, United Technologies,* 836 F.2d at 54, our opinion surely suggests that the term "promulgated," as used in 29 U.S.C. § 655(f), is far from unambiguous. Here we must deal with similar ambiguity in the context of an Interior regulation promulgated under the CERCLA. This ambiguity is sufficient to preclude our disposition of this case pursuant to *Chevron* step one.

*Third.* Turning to step two of *Chevron,* therefore, the Industry Petitioners argue that Interior's interpretation of § 113(g)(1)(B) is neither reasonable nor consistent with the purpose of the statute. *See* 467 U.S. at 844, 104 S.Ct. at 2782–83. Statutes of limitation grant repose to potential defendants, protecting them from the prejudice and uncertainty that can occur when a plaintiff files its claims only after an extended time. According to the Industry Petitioners, the effect of § 11.91(e), as Interior interprets it, could be to toll the limitation period indefinitely, thereby perpetuating stale claims and denying repose to defendants. Furthermore, the Industry Petitioners contend that Interior's interpretation is self-serving—both in extending the time during which Interior itself can pursue damage claims, and in permitting the agency to be dilatory with impunity.

The Industry Petitioners' concern about an unlimited limitation period is more than idle speculation. At one point, by imposing a deadline of 1982 for promulgating regula-

tions, 42 U.S.C. § 9651(c)(1), the Congress effectively made 1985 the deadline for filing pre–1982 claims, and imposed a three-year limitation period for claims arising after 1982. The regulations were not issued, however, until four and five years after the deadline—Type B regulations in 1986 and Type A regulations in 1987. When another three years had elapsed, both sets of regulations were set aside in part, in the *Ohio* and *Colorado* decisions, respectively. We directed Interior to revise its regulations "as expeditiously as possible," *Ohio*, 880 F.2d at 481; but the Department allowed more than five additional years to pass before it issued revised Type B regulations, and it still had not completed its revision of the Type A regulations.

Interior insists that its interpretation of § 11.91(e) is permissible under *Chevron* notwithstanding the demonstrated potential for indefinite delay inherent therein. The Department observes that no valid damage formula existed prior to 1994, when Interior revised its Type B regulations in response to the court's remand in *Ohio*. Without a final formulation of the regulations governing damage assessments, trustees could not avail themselves of the rebuttable presumption afforded under the CERCLA. Therefore, according to the Department, § 11.91(e) of the 1994 Regulations furthers a purpose of the CERCLA by preserving for public trustees the ability to initiate litigation until three years after final and valid regulations have been promulgated. Only with final regulations in place, states Interior, can a trustee who elects to follow the regulations be assured that he can prosecute a damage action under § 301(c) armed with the rebuttable presumption that the Congress made available.

Interior's claim—that trustees would be unduly prejudiced unless the provisions of § 11.91(e) of the 1994 Regulations are implemented—is unconvincing. Before the decision in *Ohio*, a trustee could have complied with the Type B regulations then in effect. Since that decision, a trustee has had three choices, none of which would run afoul of the limitation period: continue to follow the 1986 Regulations, modified as necessary to comply

with our decision in *Ohio*; file his damage claim in court and seek a stay pending the issuance of revised rules; or proceed without complying with the damage assessment rules (thereby foregoing the rebuttable presumption). Many state trustees apparently elected the first option. In their motion to intervene in this case, the States indicated that each of them "has performed or is performing natural resource damage assessments in accordance with the former rule, as modified by *Ohio*, when seeking natural resource damages." We can not discern any prejudice here that would justify exposing defendants to the endless prospect of litigation for alleged infractions many years or even decades past.

The 1986 CERCLA amendment adding § 113(g)(1)(B) was intended to accommodate Interior's delay in issuing its regulations, which had been due in 1982 and were then imminent. At the same time, in order to foreclose further delay, the Congress amended § 301(c) to require that the President promulgate regulations no later than "6 months after October 17, 1986." Once those regulations were issued, in 1986 and 1987, the work of both amendments was done.

■ Therefore, even assuming that Interior is entitled to the deference we extend to an agency when it construes a statute that the Congress has entrusted to its administration, we are compelled to hold that Interior's interpretation of the term "promulgate" in § 113(g)(1)(B) lies beyond the bounds of the permissible. While there may be uncertainty about the precise date upon which a regulation is promulgated, it is surely either the date of issuance or other formal announcement by the agency, the date of filing with the Office of the Federal Register, or the date of publication in the Federal Register. Those were the options we considered in *National Grain*, 845 F.2d at 346, and in *Environmental Defense Fund*, 713 F.2d 802, 812 (D.C.Cir.1983), and the Second Circuit considered in *United Technologies*, 836 F.2d at 54. For an agency to so stretch the word "promulgate" that a regulation might not be deemed promulgated until several years after the last of these events is simply not a reasonable attribution of intent to the Congress.

In summary, we (1) assume without deciding that Interior is authorized to interpret the term "promulgate" in § 113(g)(1)(B) of the CERCLA; on that assumption (2) conclude that the text of the statute is not so clear as to preclude Interior's interpretation under *Chevron* step one; and (3) hold that § 11.91(e) of the Department's 1994 Regulations is not a reasonable interpretation of the statute, viewed with an eye to its structure and purposes. Therefore, the date on which regulations were "promulgated" under § 301(c) was, at the latest, the date on which the Type A regulations were published in the Federal Register in 1987.

### 2. Time bar to substantive challenges

Interior contends that six of the substantive issues raised by the various petitioners were resolved in the 1986 proceedings and, because judicial review was not sought at that time, are now time-barred. The six issues relate to: (1) the identification of protocols and best available procedures; (2) the consistency of restoration measures with response actions; (3) the restoration of services to non-human resources such as wildlife; (4) the restrictions on acquisition of federal land; (5) the definition of reasonable assessment costs; and (6) the limitation of damages under the Clean Water Act. Because each issue that is potentially barred requires a separate, fact-dependent inquiry, we shall take up the time bar question as we examine the six issues individually below. At this point, however, we review the legal principles common to all six.

Section 113(a) of the CERCLA requires that judicial review of regulations promulgated under that Act must be sought if at all "within 90 days from the date of [their] promulgation." 42 U.S.C. § 9613(a). There are several exceptions to the time bar rule of § 113(a), *see Eagle–Picher Indus. v. EPA*, 759 F.2d 905, 909 (D.C.Cir.1985), two of which are relevant here. First, judicial review of a long-standing regulation is not barred when an agency reopens an issue covered in, or changes its interpretation of, that regulation; *e.g.*, if an agency in the course of a rulemaking proceeding solicits comments on a pre-existing regulation or otherwise indicates its willingness to reconsider such a regulation by inviting and responding to comments, then a new review period is triggered. *Ohio v. EPA*, 838 F.2d 1325, 1328–29 (D.C.Cir.1988). But when the agency merely responds to an unsolicited comment by reaffirming its prior position, that response does not create a new opportunity for review. *Massachusetts v. ICC*, 893 F.2d 1368, 1372 (D.C.Cir.1990). Nor does an agency reopen an issue by responding to a comment that addresses a settled aspect of some matter, even if the agency had solicited comments on unsettled aspects of the same matter.

In *American Iron & Steel Inst. v. EPA*, 886 F.2d 390, 398 (D.C.Cir.1989) (*AISI*), for example, the EPA sought comments on proposed refinements to its regulation allowing "permits-by-rule." The petitioner commented, in part, that a permit-by-rule should not be treated as a permit. The EPA acknowledged receipt of the comment, reaffirmed its contrary prior position, and briefly restated its reasoning. We dismissed the petition for review as time-barred, stating: "The 'reopening' rule of *Ohio v. EPA* is not a license for bootstrapping procedures by which petitioners can comment upon matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had re-opened the issue." *Id.* at 398.

The Industry Petitioners assert a second exception to the time bar rule, namely, that limits upon the period for judicial review apply only to procedural challenges and not to substantive claims that the agency has exceeded its authority or violated an applicable statute. *Public Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 152–53 (D.C.Cir.1990). In *Public Citizen*, we recited

> this circuit's long-standing rule that although a statutory review period permanently limits the time within which a petitioner may claim that an agency action was procedurally defective, a claim that agency action was violative of statute may be raised outside a statutory limitations period, by filing a petition for amendment or rescission of the agency's regulations, and challenging the denial of that petition.

*Id.* at 152. We went on to observe that such a circuitous process would be a waste of time and resources; accordingly, "where an agency reiterates a rule or policy in such a way as to render the rule or policy subject to renewed challenge on any substantive grounds, a coordinate challenge that such a rule or policy is contrary to law will not be held untimely because of a limited statutory review period." *Id.* at 152–53.

The Industry Petitioners misread *Public Citizen* to stand for the proposition that the substantive invalidity of a previously adopted regulation can always be asserted upon review of a later rulemaking on the same general subject even though the statutory time period for review has expired. To the contrary, we expressly stated in that opinion that the appropriate way in which to challenge a longstanding regulation on the ground that it is "violative of statute" is ordinarily "by filing a petition for amendment or rescission of the agency's regulations, and challenging the denial of that petition." *Id.* at 152.

 Only if the agency in another rulemaking (or perhaps elsewhere) reiterates its previously adopted rule "in such a way as to render [it] subject to renewed challenge on a[ ] substantive ground[ ]," *id.*, is it unnecessary for the petitioner to return to "Go." To have the agency say yet again that it adheres to the regulation it only recently reaffirmed would be pointless; absent such a reaffirmation, however, the usual reasons for requiring exhaustion of administrative remedies apply.

This prerequisite brings us back to the "reopening" rule of *Ohio v. EPA* and its progeny, which in fact we adopted in *Public Citizen*. Consistent with those prior cases, we held:

> If in proposing a rule the agency uses language that can reasonably be read as an invitation to comment on portions the agency does not explicitly propose to change, or if in responding to comments the agency uses language that shows that it did in fact reconsider an issue, a renewed challenge to the underlying rule or policy will be allowed.

*Id.* at 150. For purposes of the present case, therefore, in determining whether an issue is time-barred we will apply *Ohio v. EPA* as qualified by *Massachusetts v. ICC* and *AISI*. There is, however, one extension of that rule upon which we comment briefly. It covers a possible circumstance in which an issue might be deemed to have been constructively reopened even though it was not actually reopened within the literal meaning of the three cases.

In *Ohio* we considered the validity of regulations that set the amount of damages at the lesser of (a) "restoration or replacement costs" or (b) the "use value" of the damaged resources. 880 F.2d at 441. Because the "use value" is essentially the market value of the injured property, *id.* at 442, and because the market value of a natural resource is almost always less than the cost of restoring it, *id.* at 446 n. 13, the Department's approach virtually assured that a trustee could not recover enough money to restore, replace or acquire equivalent land, *id.* at 446. We therefore held that those regulations were inconsistent with the remedial structure and the purpose of the CERCLA.

If trustees and defendants had insufficient notice of the impending change, they might have foregone judicial review of related regulations that were of little consequence as long as the "lesser of" rule was in effect. That is, our invalidation of that rule might have changed the stakes of a court challenge. In this situation, we would likely hold that Interior's adherence to its resolution of certain issues that arose in the course of the 1986 proceeding was, even if not expressly reopened in its 1994 rulemaking, constructively reopened by the change in the regulatory context. For us to foreclose review of the agency's decision to adhere to the *status quo ante* under changed circumstances, on the ground that the agency had not evidenced a willingness to reconsider the issue, would be to deny the significance of our own earlier ruling.

That said, we do not think that there is a constructive reopening on the facts of this case because, with one exception, the parties had adequate notice of a forthcoming change that might alter their incentive to seek judicial review. The complainants in *Ohio* chal-

lenged the "lesser of" rule shortly after it was promulgated in 1986; our decision upholding that challenge was not issued until 1989. Accordingly, potential litigants were on notice by the petition for review that restoration cost rather than market value could become the predominant basis for damage assessments. In light of that possibility, they had an ample incentive at that time to protest any provision that might inflate restoration costs. Indeed, in *Ohio* itself the environmental groups, the states, and the industry petitioners promptly contested many such aspects of the 1986 Regulations. We have no difficulty, therefore, in concluding that actual rather than constructive reopening within the meaning of *Ohio v. EPA* is properly applied on these facts.

The single exception, where we do apply constructive reopening, is in evaluating Interior's contention that the Industry Petitioners are time-barred from challenging § 11.15(a) of the 1994 Regulations, which authorizes trustees to recover damages for the value of lost interim services under the Clean Water Act. There, as we shall see in Part II.B.12, the new and potentially more onerous provisions of 43 C.F.R. §§ 11.80–84, incorporated by reference into § 11.15(a), constructively reopened § 11.15(a) even though its text was unchanged and Interior evidenced no willingness to reconsider its content.

### 3. Protocols and procedures

Industry Petitioners argue that three provisions of the 1994 Regulations do not conform to § 301(c)(2) of CERCLA, the section requiring the Interior Department to issue regulations specifying

> alternative protocols for conducting assessments in individual cases to determine the type and extent of short-and long-term injury, destruction, or loss. Such regulations shall identify the best available procedures to determine such damages, including both direct and indirect injury, destruction, or loss and shall take into consideration factors including, but not limited to, replacement value, use val-

ue, and ability of the ecosystem or resource to recover.

42 U.S.C. § 9651(c)(2)(B).

Petitioners say the three regulatory provisions, next described, are not "protocols" within the meaning § 301(c)(2) because they give too much discretion to the decisionmaker.

One of the three contested provisions is § 11.82(d). This governs the selection of the restoration option and requires trustees to evaluate each possible option "based on all relevant considerations," including ten listed factors. 43 C.F.R. § 11.82(d). Petitioners think § 11.82(d) does not conform to § 301(c)(2) of CERCLA because it does not establish any threshold standards, it does not establish a hierarchy among the listed factors, and it allows trustees to consider any factor they deem "relevant."

The two other challenged provisions are contained in § 11.83, which requires trustees to select methods for determining the costs of the selected restoration option, and the value of the services lost to the public. 43 C.F.R. § 11.83. Section 11.83(b)(2) describes several cost-estimating methodologies and authorizes trustees to choose among them. Section 11.83(b)(3) states that "[o]ther cost estimating methodologies that are based upon standard and accepted cost estimating practices and are cost-effective are acceptable methodologies...." Section 11.83(c)(2) describes several valuation methodologies and authorizes trustees to choose among them. Section 11.83(c)(3) states that "[o]ther methodologies that measure compensable value in accordance with the public's [willingness to pay], in a cost-effective manner, are acceptable methodologies...." Petitioners view the catch-all provisions in § 11.83(b)(3) and (c)(3) as inconsistent with Interior's statutory mandate to specify "protocols."

▮ As to the catch-all provisions in § 11.83(b)(3) and § 11.83(c)(3), Interior claims the complaint is time-barred because a nearly identical provision appeared in the 1986 Regulations as § 11.82(d)(7). 51 Fed. Reg. at 27,750. The 1986 Regulations established a hierarchy of valuation methodologies. The rules favored market-based meth-

odologies and allowed trustees to use non market-based methodologies (including the catch-all provision) only when market-based methodologies were inappropriate. This court invalidated the 1986 provision in *Ohio v. Interior.* 880 F.2d at 462–64. In response to the *Ohio* decision, Interior eliminated the hierarchy. The new rules place no limits on when the catch-all provisions may be invoked, thus increasing the significance of those provisions. The question of the validity of the catch-all provisions was therefore reopened through the current rulemaking and petitioners' challenges to these provisions are timely.

■ On the merits, petitioners construe the word "protocols" in § 301(c)(2)(B) to mean a set of rules narrowly circumscribing the decision-maker's discretion. To support this reading, petitioners refer to several passages in the report of the Senate Committee on Environment and Public Works. S.REP. No. 848, 96th Cong., 2d Sess. (1980). The Report states that agencies should "standardize a process" for assessing natural resources damages. *Id.* at 85. "The protocols ... should provide uniform instructions that will allow for thorough site investigation in a cost effective manner." *Id.* at 86. Procedures for assessing damages should be "clearly defined" and "enumerated." *Id.* Agencies should select "the most accurate and credible damage assessment methodologies available." *Id.* The structure of the statute also highlights the need for regulations that will produce accurate natural resource damages assessments. Assessments conducted in accordance with the regulations are given the benefit of a rebuttable presumption of validity. 42 U.S.C. § 9607(f)(2)(C). As petitioners see it, this concern for accuracy underscores the need for protocols narrowly confining trustee discretion.

These are good arguments, but we are still back where we started—with the task of determining whether the regulations constitute "protocols." That single word hardly represents a clear statement of the degree of discretion the Type B protocols meant to leave to trustees. The many definitions of the word are not much help. Even the most

analogous definition—a "plan" for a medical or scientific experiment—is no more precise on the issue of the decision-maker's discretion than the word "protocol." The wording of CERCLA § 301(c)(2) also is not of much assistance; it speaks of rules that merely "identify the best available procedures" and "take into consideration factors." Brief passages in the Senate Report support petitioners' position, indicating that the protocols should "standardize a process" and "provide uniform instructions," but the Report never states exactly what the writer had in mind in referring to "protocols." A particularly uniluminating passage proclaims that "the rulemaking should produce a range of products" and that "protocols [should] be designed to accommodate the majority of potential release sites." S.REP. No. 848, *supra,* at 86.

It seems to us that each of the challenged provisions can be considered a "protocol" as § 301(c)(2)(B) uses this imprecise term. As we have said, § 11.82 governs the selection of the restoration option and requires trustees to develop several options ranging from no action to intensive action. 43 C.F.R. § 11.82(b)(1), (c). The trustee must evaluate each option based on ten listed factors and "all relevant considerations." § 11.82(d). The trustee must describe all of the options in the Restoration and Compensation Determination Plan and state his or her reasons for choosing the one selected. § 11.81(a)(1). The Restoration and Compensation Determination Plan is subject to public review and comment. § 11.81(d). Interior recognized that this provision leaves a good deal of discretion to the decision-maker, but decided that the wide range of settings in which the rules would be used made it infeasible to list each pertinent factor or to make any one factor determinative. The decision embodied in the final rule was to give trustees some leeway and to curb their discretion by requiring them to document their choices in a plan subject to public review and comment. 59 Fed.Reg. at 14,273. To this extent the instructions are standardized and they are uniform. They are procedurally confining, although not to the degree petitioners would prefer. The requirement that trustees evaluate "all relevant considerations" is also limiting, in the same way the rule permitting the

introduction only of relevant evidence at a trial is limiting. If "protocol" means a standard method of evaluation, which is what Interior reasonably seems to believe it means, § 11.82 is within the rulemaking authority CERCLA § 301(c)(2) gave to the Department.

Much the same may be said of § 11.83 and the methods it specifies for choosing cost-estimating and valuation methodologies. Trustees must define the objective to be achieved by the methodology and determine that the methodology meets four criteria: (1) that it is feasible and reliable; (2) that it can be performed at reasonable cost; (3) that it avoids double-counting; and (4) that it is cost-effective. 43 C.F.R. § 11.83(a)(2)(ii), (a)(3). Trustees must document this determination in the Report of the Assessment. In addition, if a trustee invokes the catch-all provision, the selected methodology must meet the acceptance criterion of the catch-all provision. Cost-estimating methodologies must be "based upon standard and accepted cost estimating practices and [be] cost-effective." § 11.83(b)(3). Valuation methodologies must "measure compensable value in accordance with the public's [willingness to pay], in a cost-effective manner." § 11.83(c)(3). The trustee must describe his selection of methodologies and objectives in the Restoration and Compensation Determination Plan, which is subject to public review and comment. § 11.81(a)(1), (d).

Thus, while each challenged provision leaves considerable discretion to the decisionmaker, they are part of a set of rules establishing a step-by-step process for making decisions. The rules require the decisionmaker to develop and consider options, to evaluate the options based on certain criteria, and to document the rationale for the choice among them in a plan subject to public review and comment. We conclude that Interior's decision to leave some discretion to trustees, while confining their discretion in other ways, is based on a permissible reading of the word "protocols."

### 4. Cost effectiveness

■ The 1986 Regulations required trustees to choose the most cost-effective restoration option as the measure of damages. 43 C.F.R. § 11.82(f)(1) (1986); 51 Fed. Reg. at 27,749. The 1994 Regulations eliminated this provision. The new rules require trustees to evaluate each option on the basis of its cost-effectiveness, but also to consider nine other listed factors and "all relevant considerations."

Industry Petitioners argue that Interior's decision not to require trustees to select the most cost-effective option violates CERCLA, ignores this court's decision in Ohio, and is arbitrary and capricious.

CERCLA contains no provision requiring, or even suggesting, that trustees select the most cost-effective restoration option. Both the legislative history, and this court's decision in Ohio indicate that cost-effectiveness is an important goal. S.Rep. No. 848, supra, at 85 ("actions to restore, rehabilitate, or replace natural resources under the provisions of this Act [should] be accomplished in the most cost-effective manner possible"); Ohio, 880 F.2d at 456 ("the Act requires that ... the restoration of injured resources take place as cost-effectively as possible"). Yet there is no reason to suppose that the only way to accomplish this objective is to make cost-effectiveness the determinative criterion for selecting a restoration option. The Senate Report on which petitioners rely merely indicates that Congress sought to promote cost-effectiveness by requiring trustees to develop a step-by-step plan for restoring the injured resources, not by requiring trustees to choose the least expensive option. See S. Rep. No. 848, supra, at 85.

At any rate, Interior has not written this criterion out of the 1994 Regulations. Section 11.82(d)(1) requires trustees to evaluate each option based on its cost-effectiveness. The trustees must describe the options in the Restoration and Compensation Determination Plan and state the rationale for choosing the one selected. 43 C.F.R. § 11.81(a)(1). The Plan is subject to public review and comment. § 11.81(d).

Interior offered a good explanation for not treating cost-effectiveness as determinative. Cost-effectiveness compares options producing the same level of benefits. Since the

level of benefits associated with different options is often unquantifiable, cost-effectiveness is not necessarily a useful method of evaluating those different options. 58 Fed. Reg. at 39,343. Furthermore, there will often be tradeoffs between compensable use value and restoration costs. For example, a fast-paced recovery might cost more than a slower recovery, but would result in lower interim lost use values. Since the total damages are the sum of restoration costs and compensable value, requiring trustees to select the least expensive restoration option might result in higher total damages. 59 Fed.Reg. at 14,274. We conclude that Interior's decision was reasonable, consistent with CERCLA, and with this court's decision in *Ohio*.

### 5. Gross disproportionality

The 1986 Regulations allowed trustees to recover "the lesser of" the cost of restoring the injured resource and the lost use value of the resource. The *Ohio* court invalidated the "lesser-of" rule, stating that "Congress established a distinct preference for restoration cost as the measure of recovery in natural resource damage cases." 880 F.2d at 459. The court recognized that CERCLA might permit Interior to create exceptions to the general rule in favor of restoration costs. For example, the court explained, when restoration is technically impossible, or when the costs of restoration are "grossly disproportionate" to the use value of the resource, Interior might establish use value as the measure of damages. *Id.* at 443 n. 7, 459.

Industry Petitioners argue that *Ohio* required Interior to adopt a "gross disproportionality" standard to prevent trustees from selecting a restoration option if its costs were grossly disproportionate to the use value of the injured resource. The argument is based on a misreading of *Ohio*. The court there held that restoration costs were the preferred measure of damages. But the court also held that Interior had authority to apply a different measure of damages in certain cases. Rather than requiring Interior to do so, however, the court stated that under CERCLA Interior had "some degree of lati-

tude in deciding what measure shall apply." 880 F.2d at 443 n. 7.

■ Interior's decision not to adopt a gross disproportionality rule is a permissible response to the *Ohio* decision. The 1994 Regulations require trustees to develop a range of restoration options, from no action to intensive action. 43 C.F.R. § 11.82(b)(1), (c). The trustees must evaluate each option based on factors such as cost-effectiveness and the relationship between expected costs and expected benefits. § 11.82(d)(2), (d)(3). These evaluations and the trustee's rationale for choosing the selected option must be documented in the Restoration and Compensation Determination Plan, which is subject to public review and comment. Interior reasoned—and we see no reason to disagree—that these procedural safeguards would take the place of the gross disproportionality test and ensure that trustees do not select options that are excessively costly. 56 Fed.Reg. at 19,765; 58 Fed.Reg. at 39,333–34, 39,343; 59 Fed.Reg. at 14,264, 14,271.

### 6. Consistency with response

In those instances in which a damaged resource requires both cleanup and restoration, § 11.82(d)(4) of the 1994 Regulations directs trustees to select a restoration alternative only after considering the cleanup ("response") remedy chosen by the EPA or other authorized agency for the same resource. The Industry Petitioners object because the rule does not mandate "consistency" between the restoration alternative and the response action. Interior points out, however, that the statute requires only "coordination," 42 U.S.C. § 9604(b)(2), not consistency, and asserts that the 1994 Regulations satisfy that standard.

We first examine, as a threshold matter, Interior's contention that this dispute is time-barred because it was resolved during the 1986 rulemaking and not thereafter reopened by the Department. As adopted in 1986, the regulation required trustees to take into account mitigation of injury as a result of EPA-directed response actions. 43 C.F.R. §§ 11.15(a)(1)(ii), 11.84(c)(2). The only change made in 1994 was to add § 11.82(d)(4), which elaborated upon the

"coordination" requirement in the statute by directing trustees to consider actual or planned response actions. There was no consistency mandate in either the new rule or the old.

Some of those commenting upon the proposed 1994 Regulations attempted to re-argue the consistency issue, but Interior answered the comments simply by reiterating its position and stating that "[f]urther clarification of the issue is beyond the scope of this rulemaking." 58 Fed.Reg. at 39,357. Interior maintains that this response did not indicate a willingness to reconsider the issue. *See AISI*, 886 F.2d at 398 (rule not reopened where agency responds to comment about matter not actually at issue). The Industry Petitioners remind us, however, that Interior did not simply re-adopt the 1986 regulation; it created a new provision which, they argue, implicitly reopened the subject.

 We agree. By adding new terms to the old rule, Interior once again raised the issue of the relationship between restoration and response actions. Consistency between the two remedies is arguably one aspect of that relationship; it cannot be presumed settled while other intertwined aspects of the same relationship remain in dispute. Although Interior omitted a consistency requirement from both the 1986 and the 1994 Regulations, the revised explanation of the coordination provision in the new Notice of Proposed Rulemaking in effect reopened the debate about consistency.

Turning to the merits, we see that the CERCLA authorizes response actions by the EPA, the States, and private parties to remove hazardous substances and to remedy their release. 42 U.S.C. § 9604–07. According to the Industry Petitioners, the cleanup remedy that is selected for a site can have a significant impact upon the need for other measures to redress injuries to natural resources at the same site. For example, the removal of all contaminants may reduce the extent of any restoration needed thereafter. Because the two types of remedies may overlap or at least interact, the Industry Petitioners contend that not only coordination but also consistency is imperative. In support, they cite three different provisions of the

CERCLA, providing first that the EPA must "promptly notify ... trustees of potential damages ... and ... coordinate the assessments, investigations and planning," 42 U.S.C. § 9604(b)(2); second, that trustees may not sue for damages before the EPA has selected a cleanup remedy, *id.* § 9613(g)(1); and third, that double recovery is prohibited, *id.* § 9607(f)(1).

The Industry Petitioners concede that the 1994 Regulations promote coordination and require that information be shared. *See* 43 C.F.R. §§ 11.23(f), 11.82(d)(4). Because the rule does not mandate consistency between the two regimes, however, the Industry Petitioners are concerned that trustees may ignore EPA response actions and adopt restoration procedures that are unduly costly. Interior's response is twofold: first, none of the statutory provisions cited by the Industry Petitioners demands consistency; second, the EPA and the trustees are charged with a different responsibility—to curb the release of hazardous substances and to restore natural resources, respectively.

 While these two functions will assuredly benefit from coordination, there appears to be nothing in their nature that logically compels consistency. As Interior suggests, it seems eminently reasonable that trustees be granted the flexibility and discretion to accommodate their solutions to the unique circumstances of each case. Indeed, a certain degree of inconsistency might be necessary, particularly where short-term and long-term considerations dictate seemingly conflicting responses (*e.g.*, grass to prevent erosion, followed by reforestation, which kills the grass).

Therefore we conclude that the 1994 Regulations sensibly promote coordination, rather than requiring consistency, between restoration remedies and response actions. 43 C.F.R. § 11.31(b)(3). Section 11.82(d) also requires that trustees consider response actions as one of ten factors in their decision making. This is not an unreasonable way in which to implement a statute requiring only "coordination" of responses. Therefore we defer under *Chevron* to the agency's interpretation.

*7. Services*

In the 1986 Regulations, Interior developed a concept called "services" for measuring the level of restoration of an injured resource. The resulting rules quantified the damages to the injured resource in terms of "the extent to which natural resource services have been reduced as a result of the injuries." 43 C.F.R. § 11.71(a)(1). Under the services approach, the restoration level of an injured resource is measured by looking at the level of services the resource provided rather than the physical and biological characteristics of the resource. 51 Fed.Reg. at 27,686. *See* 43 C.F.R. § 11.81(c)(1) (1986) ("Restoration or replacement measures are limited to those actions that restore or replace the resource services to no more than their baseline.").

■ The 1994 Regulations measure damages differently, in terms of "the cost of restoration, rehabilitation, replacement, and/or acquisition of the equivalent of the injured natural resources *and* the services those resources provide." 43 C.F.R. § 11.80(b) (emphasis added); *see also* §§ 11.81(a)(1), (a)(2), 11.82(a), (b)(1)(iii), (c)(1), 11.83(a)(1). Industry Petitioners argue that by creating a dichotomy between restoration of the resource itself and restoration of the services, the rule abandons the services approach. According to petitioners, the new rule requires trustees both to restore the services and to do something else. Since restoring the services by definition fully restores the resource, the only other thing to do is to replicate the physical and biological characteristics of the injured resource.

In the preamble to the 1994 Regulations, Interior defended the services approach, arguing that it makes "the public whole." 59 Fed.Reg. at 14,273. Interior also disavowed any requirement of replication in every case, stating that Congress did not intend that trustees "would, could, or should always replicate the exact same injured resources." *Id.* at 14,272. The trouble is that the regulatory language, which seems to require trustees to restore *both* the services *and* the resource itself, is not consistent with the preamble's explanation. If Interior meant to adopt the services approach in the regula-

tions, one would have expected it to define the measure of damages as "the cost of restoration ... of the services provided by the injured resource." The language actually used suggests that Interior contemplates some other approach. But it has never explained what that approach might be or what it is requiring trustees to do.

In invalidating the regulations, we do not mean to suggest that CERCLA requires or forbids any particular measure of damages. The problem here is not with the standard adopted, but with the inconsistency between the language of the regulations and the preamble's explanation of what Interior did. An agency's failure adequately to explain its action renders the action arbitrary and capricious under § 706(2)(A) of the Administrative Procedure Act. *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C.Cir.1993). So here. Because the 1986 Regulations were repealed only to the extent that they were successfully replaced with inconsistent 1994 Regulations, our invalidation of the "resources and services" provisions of the 1994 Regulations has the effect of reinstating the "services" approach under the 1986 Regulations.

■ Industry Petitioners also challenge the definition of services. Interior defines services to include services provided not just to humans but to other resources as well. Petitioners argue that this broad definition of services is inconsistent with CERCLA. We do not reach the issue, however, because petitioners' challenge is time-barred.

The 1986 Regulations defined "services" as "the physical and biological functions performed by the resource including the human uses of those functions," § 11.14(nn), and stated that services "include provision of habitat, food and other needs of biological resources ...." § 11.71(e). The preamble to the 1986 Regulations explained that "a service refers to any function that one resource performs for another or for humans." 51 Fed.Reg. at 27,686. Interior also stated that the definition of services "[did] not preclude the consideration of non-human services where the authorized official deems consideration appropriate." *Id.* at 27,697. *See also id.* at 27,687.

Interior did not propose or make any changes to § 11.14(nn) or § 11.71(e) in 1994 nor did it solicit comments on the definition of services. Some commenters criticized the services approach, arguing that it would not fully compensate the public because it focused on loss of services to humans. Although Interior responded, it did so merely by reiterating its position that the existing definition of services includes resource-to-resource services. *See* 58 Fed.Reg. at 39,339 (services "as defined in § 11.14(nn) of the existing rule, include functions performed by one resource for another or for humans"); *id.* at 39,340; and 59 Fed.Reg. at 14,273 ("Section 11.71(e) which was not affected by this rulemaking, allows trustee officials to consider inter-resource services when quantifying an injury.").

Because Interior did not reconsider the meaning of "services" in §§ 11.14(nn) and 11.71(e) of the 1994 Regulations, petitioners cannot now challenge Interior's definition of that term.

### 8. Acquisition of federal lands

■ The 1994 Regulations foreclose the acquisition of federal land as a means of relief if any alternative restoration measure is available. *See* 43 C.F.R. § 11.82(e). The Industry Petitioners argue that this provision bars trustees from using a remedy that is specifically authorized by the CERCLA, *see* 42 U.S.C. § 9607(f)(1), and violates the cost-effectiveness mandate established in *Ohio*, *see* 880 F.2d at 456 & n. 39, by prohibiting what could in some circumstances be a more economical solution. Here too, as a threshold matter, Interior maintains that the issue is time-barred because essentially the same provision appeared in the 1986 Regulations, 51 Fed.Reg. at 27,748–49, and was neither challenged then nor reopened subsequently by Interior.

The 1986 Regulations permitted "the acquisition of land for Federal management ... only if this acquisition would represent the sole viable method of obtaining the lost services." 51 Fed.Reg. at 27,748. No petitioner sought review of that restriction. In its 1991 notice of proposed rulemaking, Interior merely re-worded the provision to permit "[a]cquisition of equivalent land for Federal management where restoration, rehabilitation, and/or other replacement of land is not possible." 56 Fed.Reg. at 19,-771. The Department explained that "Federal trustees should generally consider first restoration, rehabilitation, or replacement actions, looking to the acquisition of land ... when restoration, rehabilitation, or replacement are not feasible." *Id.* at 19,762. We think it fair to conclude that there is no meaningful difference between the 1986 and the 1994 provisions.

Commenters raised the question whether the restriction upon the acquisition of federal land applies only to federal trustees; Interior responded that it does. 58 Fed.Reg. at 39,-345. There were also comments on the substantive merits of the restriction. Instead of responding directly to those comments, however, Interior reiterated its view that trustees lack congressional authorization for such acquisitions. *Id.* Ultimately, the Department adopted the text of the proposed rule, concluding that "[f]urther revision is beyond the scope of the rulemaking." 59 Fed.Reg. at 14,275.

Because Interior re-proposed virtually the same regulation that was already in effect, and declined to reconsider any aspect of that regulation pertaining to the merits of the restriction upon federal land acquisition, we conclude that it did not reopen the issue. Therefore, the current petition for review is in this respect time-barred. *See Massachusetts v. ICC,* 893 F.2d at 1371–72 (issue not reopened when agency responds to unsolicited comments and reaffirms prior position).

### 9. Cultural and archaeological resources

One purpose of the damage assessment process is to fashion a remedy for natural resource injuries that are not compensable through private litigation. *See* 132 Cong. Rec. S14930–31 (daily ed. Oct. 3, 1986) (remarks of Sens. Baucus and Stafford); 132 Cong. Rec. H9613 (daily ed. Oct. 8, 1986) (remarks of Rep. Jones). Because § 107(f)(1) of the CERCLA precludes double recovery, however, and because state tort law already provides a private remedy for injury to archaeological and cultural re-

sources, *see, e.g., Exxon Valdez Litigation,* No. 3AN–89–2533CI (Alaska Sept. 24, 1994), the Industry Petitioners contend that those types of resources are not within the purview of the Act, 59 Fed.Reg. at 14,269. Indeed, the CERCLA specifically authorizes recovery for injuries to "natural resources," *see* 42 U.S.C. § 9607(a)(4)(C), which are defined as "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources," 42 U.S.C. § 9601(16). The Industry Petitioners observe that non-natural resources, such as archaeological and cultural resources, are conspicuous by their absence.

Therefore, assert the Industry Petitioners, Interior exceeded its authority when in the preamble to its final 1994 Regulations, 59 Fed.Reg. at 14,262, the agency purported to authorize recovery for injury to archaeological and cultural resources—or more generally for loss of the "services provided by a natural resource," *id.* at 14,269. By way of illustration, Interior indicated that if land contained artifacts, then "that land might provide the service of supporting archaeological research"; and "[i]f an injury to the land causes a reduction in the level of service (archaeological research) that could be performed, trustee officials could recover damages for the lost services." *Id.* This reasoning, claims the Industry Petitioners, knows no bounds; since virtually all human activities are supported in some form by land and other natural resources, the rule would expose defendants to liability for harms that lie well beyond the stated reach of the CERCLA. Applying Interior's rationale, trustees could recover for consequential losses associated with the temporary incapacity of farms, factories, residences, office buildings, highways, and on and on—none of which is within the CERCLA's coverage of natural resources.

Interior offers three arguments in response. First, the Department argues that a preamble is nonbinding, explanatory material with no independent legal effect. Therefore, like the policy statements and guidance documents at issue in *American Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1056 (D.C.Cir.1987), a preamble is not reviewable unless and until it is actually applied in a concrete case. Sec-

ond, even if a preamble may have the force of law, Interior argues that the petitioners' challenge to the preamble in this case is not now ripe for review. According to Interior, the concerns of the Industry Petitioners are hypothetical and abstract, and they have shown neither "the fitness of the issues for judicial decision" nor that there will be "hardship to the parties" if review is withheld. *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Third, on the merits, Interior contends that recovery for loss of archaeological and cultural resources is authorized by the CERCLA.

On the ripeness issue, the Industry Petitioners reply that because they are current or potential defendants in damage recovery litigation, there is nothing speculative about their exposure; and that this issue of statutory interpretation is purely a matter of law and needs no further factual development. The Industry Petitioners also argue that Interior's characterization of the preamble as nonbinding and explanatory is contradicted by the Department's express declaration in the preamble itself that "the rule does allow trustee officials to include the loss of archaeological and other cultural services provided by a natural resource in a natural resource damage assessment." 59 Fed.Reg. at 14,269.

Considering the various arguments, we conclude below that a preamble may under some circumstances be reviewable; because the issue presented in the 1994 preamble is conjectural, however, and because a more complete understanding of its ramifications must await a concrete application, its consistency with the CERCLA is not ripe for review in this case. We do not decide, therefore, the substantive question whether recovery for injury to non-natural resources is permitted within the meaning of the Act.

■ At the outset, we cannot agree with Interior that there is a categorical bar to judicial review of a preamble. *See Center for Auto Safety v. Federal Highway Admin.,* 956 F.2d 309, 313 (D.C.Cir.1992) (preamble to FHA regulations stated that four years between bridge inspections "is suggested" but longer intervals might be approved under

"very unique [sic] and special circumstances"; court held that text not reviewable because too general). The question of reviewability hinges upon whether the preamble has independent legal effect, which in turn is a function of the agency's intention to bind either itself or regulated parties. Absent an express statement to that effect, we may yet infer that the agency intended the preamble to be binding if what it requires is sufficiently clear.

In this instance, the recoverability of damages for harm to non-natural resources was raised by commenters on the proposed rule. Interior responded to the comments in the preamble to the final rule, but did not then represent that the preamble was intended as a binding regulation and now denies that the preamble is anything more than an explanatory preface with no independent legal effect. The preamble is neither so general as to imply a mere guideline or policy statement, nor so precise as to remove any doubt about its being intended to have legal force.

Even if we were to determine that the preamble to the 1994 Regulations is reviewable, however, we would not think it fit for review at this time. Interior has indicated only that a trustee could recover damages for an injury to land that reduces archaeological research. This is no more definitive than the preamble in *Center for Auto Safety*; it does not represent an interpretation of an identified statutory provision, nor a clarification of an otherwise binding regulation. The guidance offered is hypothetical and non-specific; it is not crafted as a concrete rule that can be applied under identified circumstances. Instead, Interior has merely advised that recovery could be available for injury to non-natural resources, and illustrated one type of injury that would qualify. For all we can tell, under the preamble some consequential damages arising from an injury to land may be *per se* non-recoverable; others may generally be recoverable, but too remote to warrant recovery on the facts of a specific case; still others may be reconcilable with the statute and its regulations.

In short, the Industry Petitioners have not demonstrated that the 1994 preamble has a direct and immediate rather than a distant and speculative impact upon them. *Abbott Labs,* 387 U.S. at 152–53, 87 S.Ct. at 1517–18. We must await a concrete case where we can probe the limits of the rule in the context of a live controversy involving actual events. Unless and until Interior or another trustee invokes the preamble in an attempt to affect the outcome of a real dispute, there is little need for and no factual basis to inform our inquiry into its validity. Moreover, by awaiting a concrete case, we will then be able to ascertain with assurance that Interior intended to bind a party and that the party was thereby aggrieved. Thus will the issues of reviewability and ripeness converge. For now, we hold only that the question whether a trustee may recover under the CERCLA for injury to archaeological and cultural resources is not ripe.

### 10. Indirect costs

CERCLA authorizes the recovery of "damages for injury to, destruction of, or loss of natural resources ... resulting from" a release. 42 U.S.C. § 9607(a)(4)(C). The regulations define the measure of damages as the costs of restoring the injured resource and the value of services lost to the public until the resource is fully restored. 43 C.F.R. § 11.80(b). Costs are "the amount of money determined by the authorized official as necessary to complete all actions identified in the selected alternative." § 11.83(b)(1). These costs include direct and indirect costs. *Id.*

Indirect costs are "costs of activities or items that support the selected alternative, but that cannot practically be directly accounted for as costs of the selected alternative." 43 C.F.R. § 11.83(b)(1)(ii). This includes costs that "are not readily assignable to the selected alternative without a level of effort disproportionate to the results achieved." *Id.* The regulations state that the simplest example of indirect costs is traditional overhead. *Id.*

Industry Petitioners argue that indirect costs are not recoverable under CERCLA because they do not "result from" the release. They concede that CERCLA might allow recovery of indirect costs such as over-

head in some cases, but argue that the statute forbids recovery of costs that are not directly attributable to restoration actions at a given site. They also argue that the regulations fail to develop adequate protocols to guide the trustees' discretion in calculating indirect costs.

CERCLA left it to Interior to define the measure of damages in natural resources damage assessment cases. *See Ohio,* 880 F.2d at 443, 42 U.S.C. § 9651(c)(2). While the statutory language requires some causal connection between the element of damages and the injury—the damages must be "for" an injury "resulting from a release of oil or a hazardous substance"—Congress has not specified precisely what that causal relationship should be. We believe that the regulations represent a reasonable interpretation. All costs must be "necessary" to the selected restoration option. And indirect costs must "support" the selected option. The regulations thus require at least "but for" causation for indirect costs.

Allocating indirect costs that cannot be directly accounted for as costs of a specific project is a well-established accounting practice. Courts have allowed the recovery of indirect costs in response actions under CERCLA and, in doing so, have used language almost identical to Interior's regulatory definition of indirect costs. In *United States v. Ottati & Goss, Inc.,* 900 F.2d 429, 444 (1st Cir.1990), the court held that CERCLA authorized recovery of those costs "not readily allocable to one specific, rather than some other specific, cleanup site." In *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1502 (6th Cir.1989), the court authorized recovery of indirect costs "necessary to operate the Superfund program and to support cleanup efforts at specific sites, but that [could not] be linked directly to the efforts at any one particular site." If potentially responsible parties believe certain costs are outside the regulatory definition, they may litigate the issue when a trustee brings a recovery action.

The regulations provide procedural safeguards to ensure that indirect costs are determined accurately. When choosing a methodology for estimating indirect costs, the authorized official must describe his selection and the objectives to be achieved in the Restoration and Compensation Determination Plan, which is subject to public review and comment. 43 C.F.R. § 11.83(a)(2)(iii). In addition, the official must determine that the chosen methodology: (1) is feasible and reliable; (2) can be performed at a reasonable cost; (3) avoids double counting; and (4) is cost-effective. § 11.83(a)(3). This determination is documented in the Report of the Assessment.

The regulations also give authority to trustees to calculate indirect costs using an indirect cost rate in cases "where the benefits derived from the estimation of indirect costs do not outweigh the costs of the indirect cost estimation." When a trustee uses an indirect cost rate, he must document the "assumptions from which that rate has been derived." 43 C.F.R. § 11.83(b)(1)(iii). Petitioners argue that the provision does not give trustees enough guidance on how to develop and apply the cost rate. We do not believe that any additional guidance is necessary. An indirect cost rate is a fairly straightforward concept. The regulation identifies the criterion for permitting an indirect cost rate, limiting it to those situations in which the costs of estimating indirect costs outweigh the benefits. The regulation also requires trustees to document the assumptions forming the basis for the cost rate. These two requirements provide adequate guidance to trustees and to courts. *See also R.W. Meyer,* 889 F.2d at 1503–04 (allowing recovery of costs calculated by using an indirect cost rate).

Therefore, we conclude that the indirect cost provisions are based on a permissible reading of CERCLA, and that they provide adequate guidance to trustees, potentially responsible parties, and courts.

### 11. Reasonableness of assessment costs

*Preliminary estimate of damages.* CERCLA authorizes the recovery of "the reasonable costs of assessing" natural resource damages. 42 U.S.C. § 9607(a)(4)(C). According to the regulations, assessments costs are reasonable when, among other

things, "the anticipated cost of the assessment is expected to be less than the anticipated damage amount." 43 C.F.R. § 11.14(ee). One of the first steps of the assessment is the preliminary estimate of damages. The preliminary estimate is a rough estimate, based on existing data, of the ultimate amount of damages. The purpose of the preliminary estimate is to determine the proper scope of the assessment. The smaller the estimated damages, the more modest the assessment. The preliminary estimate is also used to ensure that "the requirements of reasonable cost" are met, § 11.35(b), that is, to ensure that the cost of the assessment is lower than the anticipated damage amount. Trustees are not required to disclose the preliminary estimate until after the assessment is complete. § 11.35(d)(3).

Industry Petitioners argue that Interior has not adequately explained its decision to use the preliminary estimate to determine the reasonableness of assessment costs, and that Interior's decision is arbitrary and capricious because the preliminary estimate is too tentative and cannot be relied on to ensure that assessment costs are reasonable. Interior has described the preliminary estimate as a "back-of-the-envelope" estimate that "will be very rough." 58 Fed.Reg. at 39,337. The regulations require trustees to base the preliminary estimate on existing data and state that trustees "should not undertake significant new data collection or perform significant modeling efforts at this stage." 43 C.F.R. § 11.35(d).

■ We see no basis for questioning Interior's decision. The definition of reasonable assessment costs is based on "anticipated costs" and "anticipated damages." Therefore any determination of the reasonableness of assessment costs will necessarily be based on less than complete information. Interior concluded that trustees needed to make some initial estimate of damages to determine the proper scope of the assessment and to ensure that assessment costs are reasonable. Interior recognized that the estimate would be rough. But the regulations create certain safeguards to mitigate any dangers this might cause. The regulations

state a preference for completing the preliminary estimate before completing the Assessment Plan phase, but allow this to be delayed "[i]f there is not sufficient data to make the preliminary estimate" at that time. 43 C.F.R. § 11.35(d)(2). The regulations also require trustees to review and revise the preliminary estimate "as appropriate" at the end of the Injury Determination and Quantification phases. § 11.35(e). Trustees must also review the Assessment Plan at the end of the Injury Determination phase to ensure that the methodologies selected for the subsequent phases—the Quantification and Damage Determination phases—"remain consistent with the requirements of reasonable cost," that is, to ensure that the chosen methodologies are not too costly in light of the anticipated damages. And the regulations require trustees to include the preliminary estimate, along with its assumptions and methodology, in the Report of the Assessment made after the assessment is complete. Interior has balanced the need for an early, rough estimate of damages against the danger of that estimate being too rough. We must defer to the agency's decision about how to strike that balance unless it is unreasonable, which it is not. *See Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 535 (D.C.Cir.1983).

■ Interior decided that the preliminary estimate need not be disclosed in the Assessment Plan. The Plan is made available for public review and comment before the assessment begins. 43 C.F.R. § 11.32(c)(1). Several commenters argued that trustees should not be required to disclose the preliminary estimate ever—either in the Assessment Plan or in the Report of the Assessment, which is released after the assessment is complete. § 11.90. These commenters argued that disclosing the preliminary estimate would make it harder for trustees to settle the case or prepare for litigation. 58 Fed.Reg. at 39,336–37.

Interior agreed that trustees need not disclose the preliminary estimate in the Assessment Plan. 58 Fed.Reg. at 39,337. Interior thought that, even without knowing the preliminary estimate, the public still would have a "meaningful opportunity to comment on the

reasonableness of assessment costs." *Id.* The public could comment on other aspects of reasonableness, such as whether each element of the assessment directly contributes to the calculation of the damages amount. *Id.* Interior decided, however, that the preliminary estimate should be included in the Report of the Assessment in order to allow the public, potentially responsible parties, and the courts a basis for evaluating the reasonableness of the assessment costs. *Id.* The record shows that Interior balanced the benefits of not requiring trustees to disclose the preliminary estimate against the benefits of disclosure. Interior's decision was reasonable and we decline to overturn it.

 *Disaggregation of assessment costs.* Some commenters asked Interior to amend the definition of reasonable assessment costs to require that the reasonableness of assessment costs be evaluated on a component-by-component basis. Under this approach, the cost of each component of the assessment would have to be less than the expected damages amount to be determined by that component. Interior responded, correctly in our view, that revision of the definition of reasonable costs was beyond the scope of the rulemaking. 59 Fed.Reg. at 14,270. The *Ohio* court upheld Interior's current definition of reasonable costs. 880 F.2d at 468. Interior did not propose any changes to the current definition or solicit any comments on the subject. In response to unsolicited comments, Interior consistently stated that the subject was beyond the scope of the rulemaking. 58 Fed.Reg. at 39,338; 59 Fed.Reg. at 14,270. Therefore, Industry Petitioners' challenge to the current definition is time-barred.

### 12. *Interim services*

Under the Clean Water Act, responsible parties are liable for the "actual costs of removal" of oil or hazardous substances discharged into navigable waters. 33 U.S.C. § 1321(f). "Costs of removal" are defined in § 311(f)(4) to "include any costs or expenses incurred by the Federal Government or any State government in the restoration or replacement of natural resources damaged or destroyed." *Id.* § 1321(f)(4). The CWA does not identify as a recoverable item the value of services lost to the public during the time in which resources are being restored or replaced. For that reason, the Industry Petitioners contend that § 11.15(a) of the 1994 Regulations, which purports to authorize trustees to recover damages for the value of lost interim services, is beyond Interior's authority under the CWA. *See* 43 C.F.R. § 11.15(a), incorporating by reference 43 C.F.R. §§ 11.80–84.

The Department argues that the present challenge is time-barred. Section 11.15(a) was originally adopted in 1986; it applies in "an action filed pursuant to section 107(f) or 126(d) of CERCLA, or sections 311(f)(4) and (5) of the CWA," and it provides that trustees may recover damages in accordance with §§ 11.80–84 of the regulations. Section 11.15(a) was not challenged in *Ohio*, and Interior did not propose to change the section during the current rulemaking. When the 1994 Regulations were proposed, some commenters observed that the CWA did not authorize recovery of "compensable value," *i.e.*, the value of interim lost services, even if the CERCLA did authorize such recovery. Interior responded: "Although the specific issue ... was not remanded ... and is not within the scope of this rulemaking, the Department believes that compensable values are recoverable under CWA." 59 Fed.Reg. at 14,271.

 The Industry Petitioners respond to the time bar argument by pointing out that the 1994 Regulations amended §§ 11.80, 11.82, and 11.83, each of which is incorporated by reference into § 11.15(a). Because these provisions control damage recovery under the CWA, because Interior modified them as a result of our remand in *Ohio*, and because the modifications expanded the remedies for lost use values, the Industry Petitioners assert that Interior's extensive changes to the underlying sections had the effect of reopening § 11.15(a). We agree. Although the dispute surrounding § 11.15(a) is centered upon the question whether damages under the CERCLA and the CWA are coextensive—a matter independent of the validity of §§ 11.80–84—the revision of those

underlying regulations significantly alters the stakes of judicial review.

Simply put, §§ 11.80–84 may not have been worth challenging in 1986, but the 1994 Regulations gave them a new significance. The incorporation by reference into § 11.15(a) of the new and potentially more onerous provisions of §§ 11.80–84 constructively reopens § 11.15(a) within the broader meaning of *Ohio v. EPA,* 838 F.2d at 1328–29, as discussed in Part II.B.2 above. We hold, therefore, that judicial review of § 11.15(a) is not time-barred.

On the merits, the Industry Petitioners argue that the broad scope of damage recovery provided in the CERCLA—"for injury to, destruction of, or loss of natural resources," 42 U.S.C. § 9607(a)(4)(C)—stands in sharp contrast to the narrower scope of recovery specified in the CWA—to "include costs or expenses incurred by the Federal Government ... in the restoration or replacement of natural resources," 33 U.S.C. § 1321(f)(4). According to the Industry Petitioners, Interior's assertion that "compensable values would be recoverable under CWA as 'costs incurred ... in the restoration or replacement of natural resources,'" 58 Fed. Reg. at 39,335, is a loser on no fewer than four scores: (1) lost services are not "costs or expenses incurred"; (2) if incurred by anyone, they are not incurred "by the Federal Government"; (3) they have nothing to do with "restoration or replacement"; and (4) Interior separately defined restoration costs (§ 11.83(b)) and compensable value (§ 11.83(c)). The latter term refers to "the amount of money required to compensate the public for the loss in services provided by the injured resources" until they are restored to their baseline condition. *Id.* Because Interior differentiates between the two grounds for recovery, the Industry Petitioners suggest, restoration costs must not encompass compensable value.

Interior correctly responds that the terms are not mutually exclusive. The cost of restoration under § 11.83(b) is "the amount of money ... necessary to complete all actions identified in the selected alternative for restoration." Nothing in this definition suggests that it could not include compensable value. That restoration cost and compensable value are separately defined in the regulation does not mean that one is not a component of the other.

Interior also points to several provisions of the CERCLA from which the agency would have the court infer that the remedies of that Act are coextensive with those of the CWA. Section 301(c) authorizes the President to "promulgate regulations for the assessment of damages for injury to, destruction of, or loss of natural resources ... for the purposes of [the CERCLA] and section 1321(f)(4) and (5) of Title 33 [the CWA]." 42 U.S.C. § 9651(c). A virtually identical provision appears in § 107(f)(2) of the CERCLA, 42 U.S.C. § 9607(f)(2). More important, a damage assessment "shall take into consideration factors including, but not limited to, replacement value, use value, and ability of the ecosystem or resource to recover," *id.* § 9651(c); and if "any provision of section 1321 of Title 33 [the CWA] is determined to be in conflict with any provisions of [the CERCLA], the provisions of [the CERCLA] shall apply," *id.* § 9654(c).

Interior's argument in a nutshell is that the CERCLA either implicitly amended the scope of allowable recovery under the CWA so that the two are coextensive or, if a conflict remains, then the CERCLA takes precedence. The Industry Petitioners reply, first, that while the CERCLA authorizes the promulgation of damage assessment regulations for CWA claims, it does not define the measure of damages under the CWA; any regulation promulgated to implement the CWA must take into account the more limited scope of recovery provided in that statute. Second, the Industry Petitioners insist that there is no "conflict" between the two statutes, merely a difference in their respective scopes of recovery; therefore the preemption provision of § 9654(c) of the CERCLA is not relevant to the present issue.

■■■ The Industry Petitioners are of course correct that § 301(c) authorizing Interior to implement damage assessment regulations does not, by itself, alter the statutory provisions of the CWA. Nor can the resultant regulations, if in contravention of the CWA, be justified on the ground that

they comply with the CERCLA. The Industry Petitioners are also correct that there is no conflict between the two statutes that would trigger the preemption provision of § 9654(c). They are compatible, however, not because the remedies under the CERCLA and the CWA are simply different rather than contradictory, as the Industry Petitioners argue. Rather, there simply is no irreconcilable difference between them. Because § 311(f)(4) of the CWA provides that damages are to "include" restoration cost, it necessarily implies that CWA damages may include other items as well; therefore the definition of restoration cost under the CWA, no matter how restrictive, does not logically foreclose the recovery of compensable value. That is, the answer to the Industry Petitioners' best argument is that even if the value of lost services is not a cost "incurred by the Federal Government," and does not therefore qualify as an element of restoration cost within the meaning of § 311(f)(4), such value may nonetheless be an element of the damages recoverable under the CWA. Those damages "include" but are not necessarily limited to restoration costs.

Next we must determine whether a statutory construction that allows for the recovery of compensable value, while not precluded by the CWA, is a reasonable interpretation of that Act. We have seen that Interior is authorized in the CERCLA to promulgate regulations that apply also to §§ 311(f)(4) and (5) of the CWA, and that recovery of compensable value falls within the scope of the CERCLA and is not foreclosed by the terms of the CWA. Consequently, our analysis of the validity of § 11.15(a) rests upon a conventional step two inquiry under *Chevron:* Does the regulation that permits recovery for the lost value of interim services represent a permissible interpretation of the CWA in light of the text, structure, and goals of that statute? If so, then Interior's interpretation is entitled to our deference.

█ Persuaded in part by the Ninth Circuit's reasoning in *Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769 (9th Cir. 1994), we conclude that the Department's interpretation of the CWA is a permissible one. In the Alaska case, the plaintiffs argued that government trustees are not authorized to recover lost use damages under either the CWA or the CERCLA and, for that reason, sport fishermen should be allowed a private right of action. *Id.* at 772. The court disagreed, pointing to the restorative purpose of both statutes, and the correlative need to funnel damage recovery through public trustees rather than to private litigants.

> [I]f we were to accept plaintiffs' argument, the result would be to severely limit the amount of damages government trustees could recover on behalf of the public in future environmental disasters. Given the restorative purposes behind the CWA and the CERCLA, it simply makes no sense to reserve a portion of lost-use damages for recovery by private parties. Unlike trustees, private parties are not bound to use recovered sums for the restoration of natural resources, or the acquisition of equivalent resources. *See* § 311(f)(5), 33 U.S.C. § 1321(f)(5).

Like the Ninth Circuit, we think that to disallow recovery for interim lost services would be to rely upon "a strained and hypertechnical reading" of the statutes in disregard of the broad public policy underlying them. *Id.*

Here, the Congress established under the CERCLA a natural resource damage assessment process that grants to trustees under both the CERCLA and the CWA remedial options not previously available to them. Perhaps most important, § 107(f)(2)(C) provides that a damage assessment made under the two statutes is entitled to a rebuttable presumption of validity if specified procedures were followed. Under this statutory structure, Interior has determined that damages may include the value of services lost while awaiting restoration of the resources. This interpretation fits easily within the broad provisions of the CERCLA, and is not incompatible with the CWA. We find no overriding policy or other reason to reject the agency's determination that the two remedial schemes are coextensive insofar as both authorize the recovery of compensable value.

### 13. Priority of remedies

In its petition, Montana claims that CERCLA requires trustees, when calculating the monetary value of the harm caused by release of hazardous substances into the environment during the "damage determination" phase of a Type B assessment, to prefer "restoration," "rehabilitation," and "replacement" of natural resources over the "acquisition of equivalent resources."

The 1994 Regulations require trustees, in the "damage determination" phase, to calculate the amount of monetary damages owed by responsible parties based on the cost of implementing the most appropriate remedial strategy. 43 C.F.R. § 11.81. To determine the most appropriate strategy, in turn, the regulations require trustees to develop a reasonable number of possible strategies involving the "restoration, rehabilitation, replacement and/or acquisition of the equivalent of the injured natural resources and the services those resources provide." §§ 11.81–11.82. Interior defines "restoration" and "rehabilitation" as synonyms, defining them as "actions undertaken to return injured resources to their baseline condition." § 11.82(b)(1)(i). It likewise defines "replacement" and "acquisition of the equivalent" as synonymous, meaning "the substitution for injured resources with resources that provide the same or substantially similar services." § 11.82(b)(1)(ii). Based on eleven factors, trustees must choose the appropriate strategy that would either return the resources to their previous condition (through restoration or rehabilitation), or substitute resources that provide substantially similar services (through replacement or acquisition of equivalent resources) or some combination of the two. See § 11.82. Except when a strategy would require a federally authorized official to acquire land that the federal government would have to manage, the regulations do not establish a preference for one strategy over another. See § 11.82(e).

In Montana's view, the statute requires Interior to favor restoration, rehabilitation, and replacement of natural resources, because they "result in a net benefit to the nation's natural resources," whereas "acquiring equivalent resources simply transfers into public ownership uninjured resources that are comparable to the injured resources." Montana's Br. at 2. While Montana's argument may have merit as a matter of policy, our task under *Chevron* is to determine if Interior's interpretation is permissible. Unlike Montana, we conclude that it is.

Beginning with *Chevron* step one, we think Congress has not clearly expressed a preference for physically restoring resources over acquiring comparable resources for the public's benefit. Montana relies on § 107(f) of CERCLA, which Congress amended in 1986 to read:

> Sums recovered by the United States Government as trustee under this subsection shall be retained by the trustee ... for use only to restore, replace, or acquire the equivalent of such natural resources. Sums recovered by a State as trustee under this subsection shall be available for use only to restore, replace, or acquire the equivalent of such natural resources by the State. The measure of damages in any action ... shall not be limited by the sums which can be used to restore or replace such resources.

Pub.L. No. 99–499, § 107(d) (amending § 107(f) of CERCLA); 100 Stat. 1613, 1630 (codified at 42 U.S.C. § 9607(f)(1)). As Montana concedes, this passage does not explicitly establish a preference for restoration and replacement. In discussing how federal and state governments can use the funds they recover, the first two sentences list three alternatives, expressing no preference among them. The third sentence merely states that damages recovered may exceed the cost of restoring or replacing resources, thus recognizing that a trustee may recover damages not only to restore an injured resource physically, but also to compensate the public for the lost use of resources during the interim period between the discharge of hazardous substances and the final implementation of a remedial plan. *Ohio,* 880 F.2d at 448, 43 C.F.R. § 11.80(b).

Montana argues, nonetheless, that the third sentence implicitly establishes a hierarchy. In making this argument, it relies on *Ohio*'s interpretation of the third sentence to mean that *"restoration* cost will serve as the

basic measure of damages in many if not most CERCLA cases." 880 F.2d at 446 (emphasis added). According to Montana, because acquiring natural resources does not involve actual *restoration* of an injured resource, our interpretation of the statute precludes trustees from using acquisition as the "basic measure of damages" during the damage determination phase of an assessment.

Placed in its proper context, our statement in *Ohio* provides scant, if any, support for Montana's position. In *Ohio*, we reviewed challenges to Interior's 1986 Type B Regulations that had distinguished between "restoration or replacement costs" on the one hand, and the "use value" of injured resources on the other. *Id.* at 441. The regulations required trustees to use the lesser of the two values in setting the amount of damages. *Id.* Because "use value" was essentially the market value of the injured property, and because market value would almost always be less than the cost of restoring the natural resources, Interior's approach virtually assured that trustees could never recover enough money to restore, replace *or* acquire equivalent resources. *Id.* at 442–446. We thus rejected those regulations as inconsistent with the statute's remedial structure and purpose. In arriving at that conclusion, we never considered, let alone established, a hierarchy among the statute's three remedial strategies—restoration, replacement, and acquisition of equivalent resources. To the contrary, we treated all of them as equivalent, generally using "restoration" as a shorthand way of referring to all three. *Id.* at 441, 445.

Montana also points to a report issued by the House Merchant Marine and Fisheries Committee, which drafted the 1986 amendments to § 107(f) of CERCLA. Noting that the third sentence of § 107(f) had "been the source of some confusion," the committee explained:

> It is clear from this language that the primary purpose of the resource damage provisions of CERCLA is the restoration or replacement of natural resources damaged by unlawful releases of hazardous substances. However, ... a situation could arise in which the amount of damages caused by a release of hazardous substances is in excess of the amount that could realistically or productively be used to restore or replace those resources....
>
> The Committee therefore intends [that] any excess funds recovered shall be used, in such an instance, for the third purpose spelled out in the language of the amendment, which is to 'acquire the equivalent of the damaged resource.' ... The Committee expects that any such acquisition would provide resources of an equivalent nature at a location as near as reasonably possible to the site at which the damages occurred.

H.R.REP. No. 253, 99th Cong., 1st Sess., pt. 4, at 50 (1985).

We agree with Montana that this report's language suggests that trustees should first consider spending the money they recover on restoring or replacing resources, and then, if doing so is neither realistic nor productive, on acquiring equivalent resources. Although these spending priorities may, in turn, imply a hierarchy in the way trustees should assess damages in the first place, we do not find the committee report a sufficiently clear statement of Congressional intent necessary to resolve this issue under *Chevron* step one. The report never explicitly establishes a hierarchy among the remedial alternatives: it does not expressly state that trustees may acquire equivalent resources only when funds could not be well spent in restoring the injured resource, nor does it otherwise state that acquisition must be considered a less favorable alternative. Moreover, a later report by another House committee discusses the three statutory remedies without suggesting any hierarchy among them. *See* H.R.REP. No. 253, 99th Cong., 1st Sess., pt. 5, at 17 (1985) (stating that "[t]he sums recovered are available for use to restore, rehabilitate, or acquire the equivalent of, such natural resources."). If Congress had intended to establish the kind of hierarchy Montana urges, it could easily have said so, either in the statute or in a committee report.

■ In light of the ambiguous statutory language and the absence of legislative history directly on point, we conclude that Congress has not clearly expressed a preference for restoration and replacement over the ac-

quisition of equivalent resources. Proceeding to step two of *Chevron,* we find Interior's interpretation of § 107(f) reasonable. Because Montana does not object to the process Interior followed in arriving at its interpretation, we consider only whether the agency's interpretation is substantively reasonable, " 'one that Congress would have sanctioned.' " *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). According to Montana, Interior's interpretation is inconsistent with the "paramount restorative purpose" of the legislation. *Ohio,* 880 F.2d at 444–45. We disagree. As Interior has explained, acquiring equivalent resources may do more to promote recovery of an injured resource than spending money directly to restore that resource. For example, acquiring land next to a damaged property may serve as a buffer to prevent nearby development from further harming the injured property, thereby increasing its chance of recovery. Moreover, although not establishing an automatic preference for restoration and replacement, Interior's regulations do not neglect the goal of restoring injured resources themselves. They require trustees, when choosing the most appropriate alternative, to consider the benefits and costs of each approach (and, in particular circumstances, a trustee may determine that restoration provides greater benefits than acquisition); consistency with federal, state and tribal policies (which may favor restoration); as well as the potential risk of additional injury to the particular injured resources under each alternative. *See* 43 C.F.R. § 11.82(d)(2), (5), (9). We think it important to remember, as well, that fulfilling the "restorative purpose" of the statute is not entirely dependent on trustees' efforts to recover damages for harm to natural resources. Their efforts are in addition to the "response" actions, which clearly serve a restorative purpose in removing hazardous waste and "prevent[ing] or minimiz[ing] the release of hazardous substances" into the environment. 42 U.S.C. § 9601(23)-(25).

We are equally unpersuaded by Montana's argument that Interior's interpretation is unreasonable in light of other statutes authorizing officials acting as public trustees to recover damages for natural resources. Montana points to two statutory provisions currently on the books: § 58(g) of the Clean Water Act of 1977, Pub.L. No. 95–217, § 58(g), 91 Stat. 1566, 1596, (codified at 33 U.S.C. § 1321(f)(4)-(5)), and § 1006(d) of the Oil Pollution Act of 1990, Pub.L. No.101–380, § 1006(d), 104 Stat. 484, 496 (codified at 33 U.S.C. § 2706(d)). It also cites provisions, since repealed, of two other statutes: the Deepwater Port Act of 1974, Pub.L. No. 93–627, § 18(i)(3), 88 Stat. 2126, 2144 (1975) *repealed by* Oil Pollution Act of 1990, § 2003(a)(2), 104 Stat. at 507, and the Outer Continental Shelf Lands Act Amendments of 1978, Pub.L. No. 95–372, § 303(b)(3), 92 Stat. 629, 674–75, *repealed by* Oil Pollution Act of 1990, § 2004, 104 Stat. at 507. Montana does not suggest that any of these four statutes directly conflicts with Interior's regulations, but only that the legislative histories of these statutes establish that Congress has consistently preferred restoration and replacement to the acquisition of equivalent resources. Even if Montana were correct about the legislative history of each of these statutes, and legislators expressed a preference in connection with statutes enacted in 1975, 1977, 1978, and 1990, Interior could still reasonably conclude that Congress did not intend such a preference when it enacted entirely different statutes in 1980 and 1986. *See Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 840, 108 S.Ct. 2182, 2191, 100 L.Ed.2d 836 (1988) (noting that the intention of the Congress that enacted the statute is controlling). We thus find Interior's interpretation reasonable.

### III. CONCLUSION

For the reasons set forth above, we grant the Industry Petitioners' petition for review with respect to Interior's interpretation of the statute of limitation (Part II.B.1) and with respect to Interior's use of "resources and services" as the measurement of damages (Part II.B.7), deny the petitions in all other respects, and affirm the judgment of the district court.

*So ordered.*