ROGERS, Circuit Judge,
concurring in part and dissenting in part.
I join the court’s opinion regarding challenges to the Phase 2 Rule[1] except in three respects. The petitioners met their burden to show reopening of both the general policies allowing new and modified sources to use offset credits from past emission reductions to meet the requirements of section 173 of the Clean Air Act (“CAA”), 42 U.S.C. § 7503, and EPA’s authority to waive interim new source review (“NSR”) Appendix S permitting requirements, 40 C.F.R. pt. 51, app. S, § VI. Additionally, the challenge to the contingency measure element of the Clean Data Policy was not forfeited because comments submitted by the NRDC and other environmental groups put EPA on notice of the challenge, which EPA, in fact, addressed.
I.
The principles underlying the reopening doctrine are well-established. It is only their application that may obfuscate the reality of what an agency regulatory action entails. This is the situation here.
*1257 Under the reopening doctrine, which is an exception to the statutory limits on the period for seeking judicial review of agency action, see Env. Defense v. EPA 467 F.3d 1329, 1333 (D.C.Cir.2006), an issue is reopened when an agency implicitly or explicitly, see West Virginia v. EPA 362 F.3d 861, 872 (D.C.Cir.2004), solicits comment on a preexisting regulation or “otherwise indicates its willingness to reconsider such a regulation by inviting and responding to comments,” Kennecott Utah Copper Corp. v. Dep’t of Interior, 88 F.3d 1191, 1213 (D.C.Cir.1996). The “entire context” must “demonstrate! ] that the agency has undertaken a serious, substantive reconsideration of the [existing] rule.” P & V Enters, v. U.S. Army Corps of Eng’rs, 516 F.3d 1021, 1024 (D.C.Cir.2008) (internal quotation marks omitted) (alteration in original). Also, when a new rule “increased the significance” of preexisting regulations, Kennecott, 88 F.3d at 1216, and thus “significantly alters the stakes of judicial review,” the new rule “constructively reopens” the previously settled issue, id. at 1227. Applying these principles demonstrates EPA reopened consideration of two subjects.
A.
Offset credits. The Phase 2 Rule allows new and modified sources to meet emissions offset requirements under CAA § 173(c), 42 U.S.C. § 7503(c), by using credits from sources that shut down or curtailed operations as long ago as August 7, 1977. See 40 C.F.R. § 51.165(a)(3)(ii)(C)(l ){ii); Op. at 1264-65. Contrary to the court’s suggestion, this court’s opinion in Kennecott makes clear that the fact that the “basic regulatory scheme remains unchanged,” Op. at 1266, is not dispositive of whether an issue has been constructively reopened. See Kennecott, 88 F.3d at 1219. Analyzing the reopening doctrine at that level of generality begs the question. If “adding new terms to [an] old rule” can result in reopening, see id., then so can removing old terms from an old rule, at least where those old terms were an important part of the underlying regulatory scheme. Furthermore, Kennecott also makes clear that the question whether the stakes are “quantitatively different,” Op. at 1266-67, does not turn on whether the petitioner or another failed to object to a different change earlier. See Kennecott, 88 F.3d at 1226-27. Although a 1989 Rule made it easier to use pre-application offset credits, see Requirements for Implementation Plans, Air Quality New Source Review, Final Rule, 54 Fed.Reg. 27,286, 27,292 (June 28, 1989) (“1989 Rule”), the concomitant addition of the attainment demonstration requirement mitigated the impact of the change and may well have meant it was not “worth challenging,” Kennecott, 88 F.3d at 1227, the regime as a whole. However, once EPA eliminated the attainment demonstration requirement and failed to replace it with a comparable substitute, the need for a challenge by environmental groups such as the NRDC arose because EPA had “dramatically expanded authority to use [pre-application offset] credits,” NRDC Br. at 44. This change meant that “a major new pollution source [may] add substantial new emissions to a nonattainment area without any contemporaneous offsets, even when the state has no plan for meeting standards and no idea of what total reductions are needed to attain standards.” Id. at 45.
Both EPA’s and the court’s analysis show that a constructive reopening occurred. See Op. at 1266-67. In announcing the 1989 Rule, EPA stated that to comply with the reasonable further progress (“RFP”) requirement of CAA § 173(a)(1)(A), 42 U.S.C. § 7503(a)(1)(A), the restriction on pre-application offset credit was “necessary both to assure RFP and to guarantee that a new source does *1258 not cause or contribute to a violation of the NAAQS,” 1989 Rule, 54 Fed.Reg. at 27,-292. This evaluation by EPA supports the conclusion that environmental groups would have determined in 1989 that it was not worth challenging the regulatory scheme as significant limits remained in place. Once EPA removed this “necessary,” id., limitation “without adding any other safeguard to ensure that issuing a particular permit is consistent with section 173’s mandate that total reductions ‘represent ... reasonable further progress,’ ” Op. at 1267 (quoting CAA § 173(a)(1)(A), 42 U.S.C. § 7503(a)(1)(A)), the stakes of judicial review were significantly altered. The court’s speculation today — that it “could have been ‘reasonably anticipated’ in 1989 that EPA might eliminate the attainment demonstration requirement,” Op. at 1266 — proves too much. Given EPA’s evaluation in the 1989 Rule of the importance of restricting the availability of preapplication offset credits, environmental groups had no reason then to lodge a challenge based on the possibility that EPA might, perhaps, at some point in the future reverse course. Cf. S. Coast Air Quality Mgmt. Dist. v. EPA, 472 F.3d 882, 898 (D.C.Cir.2006). Although the reopening doctrine may not apply if the change could have been “reasonably anticipated,” see Env. Defense, 467 F.3d at 1333, such a limit on the doctrine does not go so far as preventing review because a petitioner might have guessed EPA could later change its evaluation of what was necessary. Such an approach would render the constructive reopening precedents nugatory.
On the merits, the NRDC persuasively contends that “EPA’s final rule ... unlawfully permits total allowable emissions after the new source starts operating to be higher than emissions from existing sources before the new source applied for its permit.” NRDC Br. at 42-43. The Phase 2 Rule’s allowance of offset credit for pre-application shutdowns and curtailments is contrary to the plain text of the CAA and fails under Chevron step one. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Section 173(a)(1)(A) requires that “sufficient offsetting reductions” shall be obtained “such that total allowable emissions from existing sources in the region, from new or modified sources which are not major emitting facilities, and from the proposed source will be sufficiently less than total emissions from existing sources ... prior to the application for such permit to construct or modify so as to represent ... reasonable further progress.” 42 U.S.C. § 7503(a)(1)(A). Section 173(c)(1) requires that offsets come from “an equal or greater reduction, as applicable, in actual emissions of such air pollutant from the same or other sources in the area.” Id. § 7503(c)(1) (emphasis added); see also H.R.Rep. No. 101-490, pt. 1 (1990) (referring to reductions in “actual emissions”). Under the Phase 2 Rule, new and modified major sources may claim offset credit from reductions in emissions resulting from the shutdown or curtailment of operations from more than three decades ago. The absence of any meaningful time limit means the Rule is inconsistent with CAA § 173(c)(l)’s requirement that new sources’ emissions “shall be offset” by an equal or greater reduction in “actual emissions,” 42 U.S.C. § 7503(c)(1). Congress is presumed, absent any indication to the contrary, to have intended the ordinary meaning of the word “actual,” as “existing or occurring at the time,” Merriam Webster’S Collegiate Dictionary (10th ed.1993) (emphasis added); accord Webster’s Third New Int’l Dictionary (1993). See Engine Mfrs. Ass’n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004). Congress has given no indication in the *1259 surrounding text, or elsewhere, that it intended to depart from the common meaning of “actual.” Hence, allowing an offset for no-longer-existing emissions from sources closed decades ago is inconsistent with the statutory text.
EPA offers that because the Phase 2 Rule requires the old offsets to be included in the area’s emissions inventory, allowance of pre-application offset credits is consistent with the requirement in CAA § 173(a)(1)(A), 42 U.S.C. § 7503(a)(1)(A), that offsets ensure reasonable further progress toward attainment. See Phase 2 of the Final Rule to Implement the 8-Hour Ozone National Ambient Air Quality Standard, Final Notice of Reconsideration, 72 Fed.Reg. 31,727, 31,742/3 (June 8, 2007) (“Final Notice of Reconsideration”). But using decades-old emissions in an accounting exercise cannot render those emissions “actual” as that word is commonly understood. Likewise, EPA offers that because “[f]rom an air quality planning perspective” emissions from the previously shutdown or curtailed sources had impacted the area’s designations as nonattainment, they are “actual emissions reductions.” Phase 2 Rule, 70 Fed.Reg. at 71,677; see also Final Notice of Reconsideration, 72 Fed.Reg. at 31,742/3. But that emissions were “actual” as long ago as the 1970s does not mean they continue to meet the common understanding of “actual” years later when a source applies for a construction or modification permit.
Because the flaws in this part of the Phase 2 Rule, see 40 C.F.R. § 51.165(a)(3)(ii)(C)(I ){ii), cannot be remedied by further explanation by EPA, it must be vacated. See Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm’n, 988 F.2d 146, 150-51 (D.C.Cir.1993). To what extent the court’s holding that elimination of the requirement of an approved attainment demonstration is arbitrary and capricious under CAA § 307(d)(9)(A), 42 U.S.C. § 7607(d)(9)(A), Op. at 1266-67, will result in a different outcome than vacatur remains to be seen upon remand.
B.
NSR waiver authority. Section 110(a)(2)(C), 42 U.S.C. § 7410(a)(2)(C), does not specify what NSR requirements apply in the period between an area’s designation as nonattainment and approval of its NSR state implementation plan (“SIP”). Prior to promulgating the Phase 2 Rule, EPA had filled this statutory gap by retaining Appendix S’s interim NSR regime, which by its terms could apply for only 18 months. Given the limited duration of its effect, the previous regulation “may not have been worth challenging,” Kennecott, 88 F.3d at 1227. However, EPA’s decision to eliminate the 18-month limitation “alter[ed] the stakes of judicial review,” id. By parity of reasoning, if there was a reopening in Kennecott where industry petitioners faced a new requirement creating the possibility of the imposition of additional penalties, then there was a constructive reopening where EPA’s change meant NSR controls could be postponed indefinitely, thereby dramatically changing the scope and effect of the waiver provision.
Additionally, EPA constructively reopened the issue of its NSR waiver authority when it proposed to remove the general waiver provision in Appendix S and replace it with a “transitional” program in which waivers would be available in only a limited set of nonattainment areas. See Proposed Rule to Implement the 8-Hour Ozone National Ambient Air Quality Standard, 68 Fed.Reg. 32,802, 32,846-48 (June 2, 2003) (“NPRM”). EPA has described the proposal as a “major rewrite of [A]ppendix S.” Phase 2 Rule, 70 Fed.Reg. at 71,674. In explaining the 2003 proposal, EPA stated “we do not believe that areas *1260 not meeting the transitional approach would be able to ensure that they were implementing an NSR program ‘as necessary’ to ensure the attainment of NAAQS....” NPRM, 68 Fed.Reg. at 32,-848 (quoting CAA § 110(a)(2)(C), 42 U.S.C. § 7410(a)(2)(C)). In other words, EPA expressed doubt about a broad waiver’s consistency with statutory mandates in certain circumstances. Although it ultimately rejected the proposed alternative, EPA reopened the issue of its authority to waive interim NSR requirements by raising the question whether a broad waiver would be inconsistent with the CAA. See Edison Elec. Inst v. EPA 996 F.2d 326, 332 (D.C.Cir.1993).
On the merits, the challenge by the NRDC and the State of New Jersey to EPA’s authority to exempt new sources from the interim NSR permitting requirements is unpersuasive. They contend that “[w]here Congress has intended to allow exceptions to NSR requirements, it has expressly said so,” NRDC Br. at 38 (citing, inter alia, CAA § 173(a)(1)(B), 42 U.S.C. § 7503(a)(1)(B), excepting economic development zones). However, EPA persuasively responds that the waivers are the product of EPA’s gap-filling authority. See Chevron, 467 U.S. at 843^5, 104 S.Ct. 2778. In exercising that authority, EPA established requirements “substantially similar to the requirements of part D,” CAA § 171 et seq., 42, U.S.C. § 7501 et seq., although not identical to the “major NSR” program under Part D. See Phase 2 Rule, 70 Fed.Reg. at 71,678/1. The “minor NSR” program under CAA § 110(a)(2)(C) calls for “regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that [NAAQS] are achieved.” 42 U.S.C. § 7410(a)(2)(C) (emphasis added). EPA thus could reasonably conclude that the interim NSR requirements are inapplicable when the exemption conditions are met. In those instances, a waiver would be available only if the new source’s emissions would not interfere with timely attainment, see 40 C.F.R. pt. 51, app. S, § VI, making additional NSR requirements unnecessary.
Although EPA had authority to provide waivers on a case-by-case basis where a waiver would not interfere with timely attainment, I concur in holding that EPA’s elimination of the 18-month limitation violates the anti-backsliding provision in CAA § 172(e), 42 U.S.C. § 7502(e), see Op. at 1270-71.
II.
The Clean Data Policy, originally published in 1992 and revised in 1995, excuses state planning requirements relating to RFP, attainment demonstrations, and contingency measures for areas attaining the NAAQS but not yet redesignated as attainment areas. In commenting in 2003 on the proposed codification of this statutory interpretation, environmental groups, including the NRDC, stated that the “EPA cannot authorize states to simply drop sub-part 2 measures when the area is meeting either [the 1-hour or 8-hour] standard.” Clean Air Task Force, et al., Comments at 48. By arguing that “[t]he [CAA] allows states to move mandated controls to a maintenance contingency plan, [CAA § 175A, 42 U.S.C. § 7505a], but only after the area has been redesignated to attainment,” id. (emphasis added), environmental groups put EPA on notice of its view that until an area is designated as being in attainment, a state plan must continue to contain the antecedent requirements, such as contingency measures, applicable in nonattainment areas.
Contrary to the court’s holding that the NRDC’s challenge to the contingency plan aspect of EPA’s Clean Data Policy is forfeited, Op. at 1272-73, the rulemaking rec *1261 ord evidences that comments put EPA on notice of that objection. First, these comments raised the objection to the Clean Data Policy with respect to the contingency measures requirement of Subpart 2 “with reasonable specificity during the period for public comment,” CAA § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B), and sufficiently put EPA on notice of the objection. Second, the comment did not make a mere “general [challenge] to EPA’s approach,” Mossville Envt’l Action Now v. EPA 370 F.3d 1232, 1238 (D.C.Cir.2004) (internal quotation marks omitted) (alteration in original), but instead challenged application of a specific EPA policy — the Clean Data Policy — to a specific set of statutory requirements — those in Subpart 2 of the CAA, CAA § 181 et seq., 42 U.S.C. § 7511 et seq. The comment therefore constituted “adequate notification of the general substance of the complaint,” S. Coast Air Quality Mgmt. Dist. v. EPA, 472 F.3d 882, 891 (D.C.Cir.2006), including an objection regarding antecedent contingency measures in particular. Third, that other objections to the Clean Data Policy addressed only the requirements for RFP and attainment demonstrations does not render the broader objection insufficient to preserve for judicial review the objection to elimination of the antecedent contingency measures. Fourth, the comment that the “EPA’s ‘clean data policy,’ 68 Fed.Reg. at 32,835/3, is unlawful with respect to both the 1-hour and 8-hour NAAQS for the reasons set forth ... above [regarding RFP and the attainment demonstration],” Clean Air Task Force, et al., Comments at 100, shows that the objection was not limited to any particular aspect of the Clean Data Policy. Fifth, EPA’s response to the comments addressed contingency measures, among other requirements, further indicating the comments were sufficient to put EPA on notice of the objection. See Phase 2 Rule, 70 Fed.Reg. at 71,645/1, 71,646/1; cf. Appalachian Power Co. v. EPA 135 F.3d 791, 817-18 (D.C.Cir.1998).
Nonetheless, although the NRDC’s challenge is properly before the court, it fails on the merits. Section 172(c)(9) provides that SIPs in nonattainment areas “shall provide for implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the [NAAQS] by the attainment date applicable under this part.” 42 U.S.C. § 7502(c)(9) (emphasis added). The NRDC contends that “[t]he [Clean Data] [P]olicy waives mandatory pollution control requirements based solely on an area’s current air quality, without requiring the area to also show — as mandated by Congress — that it has met all of the [CAA]’s applicable requirements.... ” NRDC Br. at 34. However, EPA’s view that CAA §§ 172(c)(9) and 182(c)(9), 42 U.S.C. §§ 7502(c)(9), 7511a(c)(9), are written in a manner that ties the antecedent contingency measures to the requirements for RFP and an attainment demonstration, such that all are inapplicable upon attainment, see Phase 2 Rule, 70 Fed.Reg. at 71,645, is consistent with the plain text and to the extent there may be ambiguity, it is a reasonable interpretation. The Clean Data Policy requires that areas have “three consecutive years of clean air quality monitoring data demonstrating attainment of the ozone standard” before EPA can determine areas have attained. Memorandum from John S. Seitz, Director, Office of Air Quality Planning and Standards, EPA, to Various EPA Directors 5 (May 10, 1995). Also, if EPA determines an area covered by the Clean Data Policy has violated the NAAQS prior to formal designation of attainment, the Clean Data Policy no longer applies to that area. See 40 C.F.R. § 51.918.